## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| WILLIAM LINDQUIST AND DEREK J. BRUCE, DERIVATIVELY AND ON BEHALF OF JIANGBO PHARMACEUTICALS, INC., <br><br>                Plaintiffs, <br>     v. <br><br> CAO WUBO, FENG XIAOWEI, HUANG LEI, GE JIAN, GEORGE (GUOQING) ZHOU, JIN LINXIAN, ELSA SUNG, ZILING SUN, MICHAEL MARKS, AND JOHN (YANG) WANG, <br><br>           Defendants, <br><br>     - and - <br><br> JIANGBO PHARMACEUTICALS, INC., | CASE No.:1:11-cv-23876-MGC <br><br><br> AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR: <br><br> (1) BREACH OF FIDUCIARY DUTY <br> (2) CORPORATE WASTE <br> (3) GROSS MISMANAGEMENT <br><br><br> JURY TRIAL DEMANDED |

### AMENDED AND CONSOLIDATED
### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs respectfully submit this Amended Consolidated Verified Shareholder Derivative Complaint against the defendants named herein based upon personal knowledge as to themselves and their own actions, and as to all other matters, upon information and belief based upon the investigation of counsel.

### INTRODUCTION

1.      This is a shareholder derivative action on behalf of Nominal Defendant,

Jiangbo Pharmaceuticals, Inc. ("Jiangbo" or "the Company") against Defendants Cao Wubo, Feng Xiaowei, Huang Lei, Ge Jian, George (Guoqing) Zhou, Jin Linxian, Elsa Sung, Ziling Sun, Michael Marks, and John (Yang) Wang, for violations of fiduciary duties owed by them to Jiangbo.  These violations, in turn, have substantially injured the Company.

2.  As detailed herein, during the Relevant Time Period (defined herein), the Individual Defendants in breach of their fiduciary duties to the Company approved, acquiesced, and/or turned a blind eye to an undisclosed related party transaction between an entity majority owned by defendant Cao Wubo, Shandong Hilead Biotechnology Co., Ltd. ("Hilead") on one hand, and the Company on the other hand (the "Hilead Transfer").

3.  The Individual Defendants caused Jiangbo to transfer RMB 200 million (or approximately $31 million (US) using current exchange rates) to Hilead, and attempted through their action and/or inaction to conceal the true nature of this transfer.

4.  There is no legitimate business reason for the undisclosed transfer of nearly $31 million dollars to Hilead, other than to wrongfully enrich defendant Cao Wubo. When regulators learned of the Hilead Transfer, they initiated proceedings against the Company, and the Company initiated an internal investigation.

5.  Only four months after the initiation of the Company's internal investigation, two independent members of Jiangbo's Audit Committee, Defendants Michael Marks ("Marks") and John Wang ("Wang") resigned from the Company.  In a 23 page resignation letter, dated June 6, 2011 (the "Resignation Letter") (copy attached hereto as Ex. A), Defendants Marks and Wang detailed the Company's refusal to

cooperate with the Audit Committee's investigation; the refusal of defendants Cao Wubo and Linxian Jin to provide necessary materials to the forensic accountant and counsel retained by the Audit Committee in connection with its investigation; and additional financial improprieties.

6.      In addition, as alleged more fully below, the Company now faces substantial liability in connection with federal securities fraud class action litigation that has been filed against it and others based upon the same wrongdoing as alleged herein.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2).  Plaintiffs and Defendants are citizens of difference states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

## THE PARTIES

**Plaintiffs**

9.      Plaintiff William Lindquist and Derek J. Bruce are, and at all times relevant hereto were, shareholders of Jiangbo.  Plaintiffs bring this action derivatively in the right of and for the benefit of the Company.  Plaintiffs will fairly and adequately represent the interests of the Company and its shareholders in enforcing the rights of the Company.  Plaintiff Lindquist is a citizen of the state of Texas and Plaintiff Bruce is a citizen of Bermuda.

**Nominal Defendant**

10.     Nominal Defendant Jiangbo is a Florida corporation with its principal

executive offices located in Laiyang City, Yantai, Shandong Province, People's Republic of China ("PRC").  According to the Company's Form 10-K filed with the United States Securities and Exchange Commission (the "SEC") on September 28, 2010, Jiangbo is a holding company that operates, controls, and beneficially owns through contractual arrangements Laiyang Jiangbo Pharmaceuticals Co. Ltd. ("Laiyang Jiangbo").  "Laiyang Jiangbo researches, develops, manufactures, markets and sells pharmaceutical products and health supplements in the PRC."  Jiangbo's common shares commenced trading on May 12, 2009, on the OTCBB under the ticker symbol "JGBO."  On June 8, 2010, Jiangbo's shares were listed on the Nasdaq Global Market.  Trading of Jiangbo's shares was suspended by the Nasdaq on August 4, 2011, and its shares were delisted on October 17, 2011.

### Individual Defendants – Current Directors

11.     Defendant Cao Wubo ("Cao") has served as the Company's Chairman of the Board since October 2007.  From October 2007 to June 2010, Cao also served as its Chief Executive Officer ("CEO"). He has served as the chairman and general manager of Laiyang Jiangbo since 2003.  He is the founder of Laiyang Jiangbo.  According to the Company's Schedule 14A filed with the SEC on May 31, 2011, Cao owns approximately 35.8% of Jiangbo's outstanding shares. Cao is also the Chairman, CEO, and majority owner of Hilead.  Upon information and belief, Cao is a citizen of the PRC.

12.     Defendant Feng Xiaowei ("Feng") has been a Jiangbo director since October 2007.  Feng serves on the Company's Audit Committee, and is Chairperson of the Compensation Committee and the Nominating and Corporate Governance Committee.  Upon information and belief, Feng is a citizen of the PRC.

13.     Defendant Huang Lei ("Huang") has been a Jiangbo director since October 2007.  Huang serves on the Company's Nominating and Corporate Governance Committee.  Upon information and belief, Huang is a citizen of the PRC.

14.     Defendant Ge Jian ("Ge") has been a Jiangbo director since October 2007.  Ge serves on the Company's Compensation Committee and Nominating and Corporate Governance Committee.  Upon information and belief, GE is a citizen of the PRC.

15.     Defendant George (Guoqing) Zhou ("Zhou") has been a Jiangbo director since May 27, 2011.  Zhou is a member of the Company's Audit Committee.  Upon information and belief, Zhou is a citizen of the PRC.

**Individual Defendants – Current and Former Officers**

16.     Defendant Jin Linxian ("Jin") has been Jiangbo's CEO since July 2010.  Before that, Jin was Deputy General Manager of Production Technology at Laiyang Jiangbo.  Upon information and belief, Jin is a citizen of the PRC.

17.     Defendant Elsa Sung ("Sung") was Jiangbo's Chief Financial Officer ("CFO") from 2007 until her resignation effective March 31, 2011.  Sung is a licensed CPA in the State of Georgia and a member of the American Institute of Certified Public Accountants.  Upon information and belief, Sung is a citizen of Florida.

18.     Defendant Ziling Sun ("Sun") has been the Company's Interim CFO since May 12, 2011.  Sun worked at Laiyang Jiangbo prior to being appointed Jiangbo's Interim CFO.  Upon information and belief, Sun is a citizen of Massachusetts.

19.     The defendants described in ¶¶ 11-15 above shall be referred to henceforth as the "Director Defendants."  The defendants described in ¶¶ 11-18 above shall be referred to henceforth as the "Individual Defendants."

**Individual Defendants - Former Directors**

20.     Michael Marks ("Marks") was a Jiangbo director from July 18, 2008, until June 6, 2011.  Marks was the Chairperson of the Company's Audit Committee.  Upon information and belief, Marks is a citizen of the PRC.

21.     John (Yang) Wang ("Wang") was a Jiangbo director from September 8, 2008, until June 6, 2011.  Wang was a member of the Company's Audit Committee and Compensation Committee.  Upon information and belief, Wang is a citizen of the PRC.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

22.      The Individual Defendants, because of their positions of control and authority as directors or officers of the Company, were able to and did, directly and indirectly, control or fail to control the wrongful acts complained of herein.  Because of their directorial and executive positions with the Company, each of the Individual Defendants had access to adverse non-public information about the financial condition and operations of the Company, including, without limitation, the misconduct of the other Individual Defendants.

23.     At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of said agency.

24.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial, business, and corporate affairs of the Company. By virtue of such duties, the officers and directors of the Company were required, among

other things, to:

    a.    Manage, conduct, supervise and direct the business affairs of the Company in accordance with the laws of the United States, the states and countries in which it conducted business, and the Company's charter and bylaws;

    b.    Implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors, and employees of the Company from violating or acting in contravention to applicable federal and state laws, rules and regulations, and those of the countries in which it conducts business; and

    c.    Refrain from using their status as directors or officers to the detriment of the Company and its shareholders.

25.    Each of the Individual Defendants further owed to Jiangbo the duty of loyalty requiring that each favor Jiangbo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage, which requires, *inter alia*, scrutiny of interested party transactions and rejection of such transactions which are unfair to the Company or evince corporate waste. The duty of loyalty further requires a duty of candor requiring full and candid disclosure of all facts relevant to any potential conflict of interest and said interested party transactions.

26.    The Board has an Audit Committee. According to the Company's May 31, 2011, Schedule 14A, "The purpose of the Audit Committee is to assist the Board in fulfilling its responsibilities to oversee the Company's financial and accounting operations. The Audit Committee reviews and is responsible for, among other things, the Company's system of internal controls, its financial reporting process, the audit process, and the Company's processes for monitoring compliance with laws and regulations. Specific responsibilities of our Audit Committee include, among other things:

- Review and approve all transactions with affiliates, related parties, directors and executive officers.

- Appoint, compensate, retain and oversee the work of any independent auditor engaged for the purpose of conducting the annual audit of the Company's books and records, preparing or issuing an audit report or performing other audit review or attest services for the Company.

- Review the independent auditors' performance.

- Discuss with the independent auditor and management the independent auditor's judgment about the quality, not just the acceptability, of the Company's accounting principles.

- Following an audit, review significant difficulties encountered during the audit.

- Review significant disagreements among management and the independent auditors in the preparation of the Company's financial statements.

- Review and approve of all transactions with affiliates, related parties, directors and executive officers."

## SUBSTANTIVE ALLEGATIONS

27.     On March 30, 2011, Jiangbo engaged Bernstein & Pinchuk LLP ("B&P")

as its principal accountant to replace Frazer Frost, LLP ("FF"), which advised the

Company that it did not intend to stand for re-appointment as its principal accountant for

its next fiscal year.  The change in accountants was approved by the Audit Committee

and the full Board.  According to a Form 8-K filed with the SEC on April 4, 2011, the

change "did not result from any dissatisfaction with the quality of professional services

rendered by FF."   Additionally, "[i]n connection with the audit of the Company's

financial statements for the fiscal years ended June 30, 2010 and 2009 and the subsequent

interim period, (i) there were no disagreements with FF on any matter of accounting

principles or practices, financial statement disclosure, or auditing scope or procedures,

which disagreements, if not resolved to FF's satisfaction, would have caused FF to make reference in connection with its opinion to the subject matter of the disagreement, and (ii) there were no "reportable events," as that term is described in Item 304(a)(1)(v) of Regulation S-K."

28.     In a Form 8-K filed with the SEC on April 20, 2011, the Company stated it was notified that, effective April 14, 2011, B&P had entered into a joint venture agreement with Marcum LLP and formed Marcum Bernstein & Pinchuk LLP ("Marcum BP") "in a transaction pursuant to which B&P merged its China operations into Marcum BP and certain of the professional staff of B&P joined Marcum BP as employees of Marcum BP."   As a result, on April 14, B&P resigned as Jiangbo's independent accounting firm and was replaced, with the approval of the Audit Committee, by Marcum BP.

29.     In a Form 10-Q/A filed with the SEC on May 27, 2011, Jiangbo disclosed for the first time that it had:

> received a letter of informal investigation dated December 22, 2010 from the . . . SEC . . . requesting the Company to provide certain documents. The letter indicated that the Company should not construe the investigation as an indication by the SEC or its staff that any violation of law has occurred or any adverse reflection on any person, entity or security.
>
> In February 2011, the Company, through its Audit Committee, commenced an internal investigation into certain transactions.  ***On March 26, 2011, the staff of the SEC having been informed by the Company of its internal investigation, notified the Company that it had begun a non-public formal investigation and requested certain information and materials relating to certain aspects of the Company's public disclosures and operations.*** The SEC has advised the Company that its investigation is not intended to suggest that the SEC believes at this time that the Company has done anything wrong and is in fact a fact finding investigation. ***The Company is committed to cooperating with the SEC Investigation and has responded to the SEC's request for materials and***

> *information.  In light of the SEC's investigation, the Company, through its Audit Committee, decided that the investigation should be conducted as an independent investigation and that the scope of the independent investigation should cover all issues raised by the SEC Investigation.*  To that end the Audit Committee retained an international, U.S.-based law firm and an international professional accounting firm to conduct a comprehensive review of the issues raised by the SEC Investigation.  The SEC Investigation and the Independent Investigation are still in their early stages, and the Company cannot predict the duration or outcome of the investigations, or the impact, if any, those investigations may have on the Company's financial condition or results of operations.

(emphasis added).

30.     The Audit Committee retained the law firm of Cadwalader, Wickersham & Taft LLP ("Cadwalader") to conduct the independent investigation at the direction of the Committee.  The Committee also retained Ernst & Young (China) Advisory Ltd. ("E&Y") to provide forensic accounting services at Cadwalader's direction.

31.     Trading in the Company's shares was halted by the Nasdaq on May 31, 2010 and never resumed.

32.     On June 7, 2011, the Company filed a Form 8-K with the SEC (the "June 7, 2011 8-K").  It said that:

> On May 23, 2011, the Board of Directors of the Company received a letter from its independent director, Mr. Michael Marks, dated May 23, 2011 ("Mr. Marks' First Letter"), in which Mr. Marks informed the Company that he did not wish to stand for re-election to the board at the Company's 2011 annual meeting of stockholders which is scheduled to be held on June 28, 2011 at 9:00 a.m. Beijing Standard Time, which is equivalent to June 27, 2011 at 9:00 p.m. U.S. Eastern Standard Time (the "Annual Meeting"). As a result, Mr. Marks would also cease to be a member of the Company's Audit Committee from the date of the Annual Meeting. Mr. Marks informed the Company that his decision not to stand for re-election at the Annual Meeting was due to increased professional commitments as a result of which he will be unable to commit the appropriate time to the Company's affairs.

33.     The Marks' First Letter specifically stated:

With respect to the nomination by the members of Nominating and Corporate Governance Committee for my reelection as independent director at the company's forthcoming AGM, I would like to inform that committee, and the entire Board of Directors of Jiangbo, that I will not be standing for reelection as independent director at the forthcoming AGM when my current term expires. I have increasing professional commitments and will be unable to commit the appropriate time to Jiangbo in the future. Furthermore, I believe that as part of good corporate governance, the company should change its independent directors every few years and I am coming up the end of three years of service.

Provided the company continues to fulfill its obligations as a U.S. public company, I am willing to serve until the end of my current term and continue to assist the company with its endeavors in respect of the capital markets and the regulators in the U.S. until the AGM.

34.     The June 7, 2011 8-K further stated the Board had received a similar letter from Wang. It stated:

In addition, on May 23, 2011, the Board of the Company received a letter from its independent director, Mr. John Wang, dated May 23, 2011 ("Mr. Wang's First Letter"), in which Mr. Wang informed the Company that he did not wish to stand for re-election to the board at the Company's Annual Meeting. As a result, Mr. Wang would also cease to be a member of the Company's Audit Committee and Compensation Committee from the date of the Annual Meeting.

35.     The Wang First Letter stated:  "As with Michael [Marks], I am also coming on 3 years of service as an independent director. Therefore, I will also not stand for re-election at the upcoming AGM. Please make the appropriate plans with legal counsel to amend the proxy documents as appropriate."

36.     The June 7, 2011 8-K noted that on May 26, 2011, Wang informed the Board by letter ("Wang's Second Letter") that he had certain disagreements with the Company. Wang's Second letter stated:

If the Company needs an enumeration of differences there are too many to list exhaustively. Suffice it to say, there are many areas where I have disagreement with the Company. Specifically, I believe the Company should comply with the requests by E&Y and [Cadwalader], including but

not limited to the requests for Elsa [Sung]'s computer and a list of all the computers and emails used by employees for business purposes. Moreover, I believe (and the Audit Committee has asked for over a year now) the Company should implement standard 404 policies as suggested by KPMG. Furthermore, I believe (and we have also asked for over a year) the Chairman should delegate check approval control to the CFO or CEO. Finally, I also disagree with the common practice by the company (also related to control over check writing) of late payment of professional fees, expenses, even salaries and financial obligations to investors/debt holders. These practices are unprofessional and increases risk to the company, it's [sic] management and shareholders. Something as little as showing up for organized board calls and participating attentively is an important aspect of this professionalism.

I hope the company can bring its business policies and procedures more in line with international best practices. It is my sincere belief that these improvements would greatly benefit the Company, it's [sic] shareholders and it's [sic] management.

I hope that you can understand why I am not able to include that sentence in the 8K. If you think this email should be disclosed in the 8K then I will stand by that decision. I will leave that decision to the Company.

37.     The June 7, 2011 8-K stated the Board received a second letter from Marks dated June 6, 2011.  This letter said Marks was resigning immediately from the Board and the Audit Committee for the reasons stated in a separate letter to the Board also dated June 6, 2011.  The letters were included as exhibits to the June 7, 2011 8-K.

38.     The June 6, 2011 letter that Individual Defendant Marks wrote to the Board on behalf of the Audit Committee (the "Audit Committee Letter") contained shocking allegations about the Company's refusal to cooperate with the Committee's independent investigation.  It stated in part:

the conduct and statements by the Company and those controlling and advising it have demonstrated a clear and continuing lack or cooperation over the past five weeks. Moreover, the manner and timing of the Company's payments to the Audit Committee's advisers (Cadwalader and E&Y) raise additional serious concerns regarding the veracity or correctness of banking information provided by the Company, and regarding the Company's ability and willingness to pay for necessary costs

related to the internal investigation. As a result, the Audit Committee has determined that it can no longer effectively conduct an independent investigation as contemplated in the Audit Committee. The independent internal investigation has been halted. Cadwalader and E&Y have withdrawn from their respective engagements with the consent of the Audit Committee, and the independent members of the Audit Committee have determined to resign, effective today, as will be communicated in separate resignation letters to the Board of Directors.

39.     The Audit Committee letter went on to describe in detail the Audit Committee's repeated efforts to explain to Jiangbo's directors and management, in particular Individual Defendants Cao, the importance of the independent investigation vis-à-vis the SEC investigation; the need for the Committee's investigation to remain independent; the necessity for complete cooperation from the Company; the inability of Cadwalader and E&Y to share information about the investigation with the Company; the requirement that the Company pay Cadwalader and E&Y timely; the potential consequences to the Company if the SEC was not satisfied with the investigation; and other critical factors regarding the investigation.

40.     Despite this, the Audit Committee letter described numerous instances in which Individual Defendant Cao, and others such as Individual Defendants Jin and Sung acting at his direction, refused to release information deemed critical by Cadwalader and E&Y including bank statements, claimed he did not understand the purpose of the investigation, requested sensitive information from Cadwalader and E&Y, refused to pay professional fees in full, paid partial fees from a personal rather than a Company account, and maintained the disclosure of certain information would violate Chinese law, among other things.

41.     Individual Defendant Marks summarized his reasons for resigning in the Audit Committee letter as follows:

1.  *Lack of Cooperation.*  Over the past five weeks, the Company has revealed an overall and continuing lack of cooperation, evidenced most recently by the fact that the documents and information received from the Company to date still remain deficient in substantial respects. In light of this conduct, the Audit Committee, Cadwalader and E&Y have been unable to conduct a thorough, independent internal investigation. Despite numerous and lengthy meetings, phone calls, emails, and memoranda in which expert advisors explained the importance of the internal investigation and the Company's cooperation with it, and despite the warnings of the potential serious ramifications of the Company's lack of cooperation, the situation has not improved in any material way. We can conclude that the Company, and in particular Mr. Cao, does not have the intention to cooperate with the internal investigation.

2.  *Manner and Timing of Payments to the Audit Committee's Advisors.*  Although the Company has made certain invoice payments and retainer payments to Cadwalader and E&Y, the manner and timing of those payments have raised serious concerns regarding the Company's willingness and ability to pay for necessary investigative costs, and concerns about the veracity of banking information previously provided to Cadwalader and E&Y. In particular, the Company has previously provided documents indicating that it has a large cash balance at [redacted in original] representing approximately [redacted in original]% of the Company's cash balance as of December 31, 2010. Nevertheless, the Company has not paid Cadwalader and E&Y from its accounts at [redacted in original]. Rather, the Company has paid the Audit Committee's advisers from either a much smaller Company account at [redacted in original] or, more troubling, from a personal bank account apparently belonging to an individual employee of Jiangbo. The Company also had previously indicated that the Company does not use and does not have access to Internet banking, but the Company transferred funds to the Audit Committee's advisers via Internet banking. Finally, although the Company pledged to timely pay an agreed-upon retainer to Cadwalader, the Company paid that retainer in piece meal and only days after it had indicated it would be paid in full. The Company explained to Cadwalader that the delay and partial payments were due to limitations placed on the Company's transfer of funds by the Company's banks. This explanation for the timing and manner of payment is either a troubling indication that the Company does not have free access to its cash balances, or a misleading excuse meant to hide the fact that the Company is unwilling to timely and fully honor its obligations to the Audit Committee.

15

3.     *No Realistic Options for Corrective Action.*  The Audit Committee has carefully considered potential ways in which the Company might be able to remediate the current situation, but have concluded that any such steps would be ultimately insufficient to permit the internal investigation to continue. Because we believe the primary source of the lack of cooperation is the Chairman, we have considered asking Mr. Cao to step down during the pendency of the internal investigation. However, we are convinced such a measure would be futile. First, we cannot unilaterally remove the Chairman for the pendency of the investigation, and understand that the Board would not act to remove Mr. Cao. Second, it is unreasonable to believe that Mr. Cao would voluntarily step down as Chairman. Third, even if Mr. Cao were to relinquish the chairman's position during the pendency of the internal investigation, the Audit Committee would fully expect, based on our experience and knowledge of the Company, that Mr. Cao would continue to exercise *de facto* control ever the Company and the Board. The recent and consistent history of the Company's lack of cooperation with respect to the internal investigation is therefore more than likely to continue, and has made it impossible for Cadwalader and E&Y to continue the internal investigation in a credible and appropriate manner. Under such circumstances, the independent members of the Audit Committee can no longer serve the interests of shareholders by remaining on the Board.

42.     The Audit Committee letter was signed by Marks and Wang.

43.     Among the issues subject to the investigation were an RMB 200 million capital payment to Hilead, an entity for which Individual Defendant Cao serves as Chairman and CEO and is the majority stockholder, and whether the Company had misrepresented the amount of cash on hand, among other things, in its financial statements.

44.     Also included with the June 7, 2011 8-K were letters from Marks and Wang dated June 6, 2011, tendering their immediate resignations from the Board.  The Marks letter stated he was resigning because "for the reasons detailed in writing to you in a separate letter of today's date, I feel the Company has made it impossible for me to

fulfill my duties and that I have no choice but to resign.  It is my sincere hope that the Company can quickly rectify the circumstances that have occasioned my resignation." The Wang resignation letter contained substantially the same language.

45.     On August 1, 2011, the Company filed a Form 8-K with the SEC in which it stated it had received a letter from the Listing Qualifications Staff of the NASDAQ on July 26, 2011.  The letter said that Nasdaq staff "believes that the continued listing of the Company's securities on Nasdaq is no longer warranted and has determined to delist the Company for the following reasons:"

> (1)     Public interest concerns under Nasdaq Listing Rule 5101 raised by the efforts of the Company and its Chairman to obstruct the independent internal investigation authorized by its Audit Committee, and the failure to allow the Audit Committee to fulfill its responsibilities and duties;

> (2)     The Company's failures to comply with Listing Standard Rule 5605(c)(3) and IM-5605-5, which sets forth the responsibilities and authority of the Audit Committee, as well as the statutory responsibilities and authority of the Audit Committee set forth in Section 10A(m)(2) of the Securities Exchange Act of 1934; and

> (3)     the failure by the Company to comply with the Audit Committee composition requirements of Listing Rule 5605(c)(2)(A).

The July 26, 2011 letter continued:

> Unless the Company requests an appeal of Nasdaq's determination to delist by August 2, 2011, trading of the Company's shares of common stock will be suspended at the opening of business on August 4, 2011, and a Form 25-NSE will be filed with the Securities and Exchange Commission, which will result in the Company's securities being removed from listing and registration on Nasdaq.

> The Company has decided to focus on addressing current issues facing the Company and its business and will not appeal Nasdaq's determination.

46.     On October 6, 2011, the Nasdaq filed a Form 25 with the SEC advising that Jiangbo's stock would be delisted on October 17, 2011, because "Nasdaq Staff

determined that the Company no longer qualified for listing on the Exchange pursuant to Listing Rules 5101, 5605(c)(3), IM-5605, and 5605(c)(2)(A)."  Trading never resumed after the Company's stock was suspended on August 4.  Its stock is now nearly worthless, trading on the OTC Pink Sheets in very light volume for well under $0.25 per share.

47.     During the Relevant Time Period, from May 17, 2010 to the present, the Individual Defendants in breach of their fiduciary duties to the Company approved, acquiesced, and/or recklessly ignored an undisclosed related party transaction between Hilead, which is majority owned by Individual Defendant Cao, and the Company on the other hand.

48.     The Individual Defendants caused Jiangbo to transfer RMB 200 million (or $31 million (US) using current exchange rates) to Hilead, and attempted through their action and/or inaction to conceal the true nature of this transfer (the "Hilead Transfer").

49.     According to the Company' Form 10-K filed with the SEC on September 29, 2010, and the Schedule 14A filed with the SEC on May 31, 2011, Jiangbo leases two warehouses from Hilead at a cost of approximately $103,000.  There is no legitimate business reason for the undisclosed transfer of nearly $31 million dollars to Hilead, other than to wrongfully enrich Individual Defendant Cao.

50.     Recently, information concerning a possible motive for the Hilead Transfer has been disclosed on the Internet. In a message board posting concerning Jiangbo appearing on *Yahoo! Finance*, dated January 18, 2012, an individual identified as "rto_watcher" writes that Individual Defendant Cao is presently involved in efforts to take Hilead public through an initial public offering:

> Cao Wubo is currently working on a China IPO of his new company
> Hilead (incidentally, never resolved that whole issue of of [sic] millions of

dollars of (Jiangbo? Cao's personal?) money being used to found Hilead...)

His active backer there seems to be Dr. Li Huang, current Director of the Institute of Microbiology at the Chinese Academy of Science: http://www.im.ac.cn/sklmr/EN%20version/m...

Dr. Li Huang seems to have somehow come across a rather nice car and big house worth a few decades of his salary since meeting Mr. Cao a few years ago, and has since joined Cao Wubo as author of a number of patents, with Cao Wubo (the one and the same we all know and love) as first author. Apparently Cao has picked up quite a bit of chemical engineering since graduating from middle school.

These patents can be searched for by number at China's online database:

http://www.sipo.gov.cn/

under the patent numbers:

201010160253.7
201010160267.9
201020175452.0
201020175477.0
201020175521.8
201020175530.7[1]

Apparently Dr. Huang and his buddies have also issued some official reports on Chinese Academy of Science (CAS) letterhead to the government on behalf on Cao's new company Hilead (aka "Jiangbo II") claiming they've signed letters of intent to sell almost 60,000 Tons of their product in one day and a multiyear agreement to supply 30,000 Tons per year to Dupont in the United States alone in 2009. Oddly, market research firms such as CMAI seem to believe the entire world market size was less than that number, and China customs seems to think Hilead exported less than 20 tons in 2009.

Apparently that has changed in their China IPO prospectus, with those 60,000 no longer being signed with BASF, Dupont, etc.. in that same time period, but either with a European company with a long and very hard to pronounce name and seeming randomly arranged vowels and consonants, or the Chinese military, depending on which draft of the prospectus on happened to be reading.

Their auditor comments noted:

1) it seemed highly irregular for them not to provide data such as accounts receivable, inventory, bills of lading, etc...but simply letters of intent to validate their sales. Furthermore, their letters of intent with all their customers seemed to all be written and signed in their own standard

format.

2) for all the profits they're making, why haven't they paid any taxes? . . . .

*Id*. Thus, the Hilead Transfer may have been consummated to improperly bolster Hilead's financial position in anticipation of that IPO.

51. Plaintiffs' counsel has confirmed some of the poster's allegations. The State Intellectual Property Office of the P.R.C. does, in fact, list Individual Defendant Cao as the primary inventor of these patents filed by Hilead. *See* http://59.151.93.237/sipo_EN/search/quickSearch.do?method=search (last visited on Jan. 20, 2012). It is noteworthy that along with Individual Defendant Cao, an individual named Wang Zhizhou is listed as one of the inventors on each of these patents. According to *The New York Times*, Wang Zhizhou is a former Deputy General Manager of Cathay Industrial Biotech ("Cathay"), and co-founder of Hilead, who is alleged to have stolen trade secrets from Cathay which were then used by Hilead. *See* David Barboza, *Entrepreneur's Rival in China: The State, The New York Times* (Dec. 7, 2011), http://www.nytimes.com/2011/12/08/business/an-entrepeneurs-rival-in-china-the-state.html?pagewanted=1&_r=1.

52. Indeed, when regulators learned of the Hilead Transfer, they initiated proceedings against the Company; and the Company initiated an internal investigation. Defendant Cao did not cooperate with the regulatory proceedings or the internal investigation. Rather he used his control over the Company and Board to obstruct and ultimately halt the internal investigation concerning the Hilead Transfer.

53. The purpose of the Audit Committee's investigation was to prevent further harm to the Company through further regulatory actions and potential shareholder litigation.

54.     The Audit Committee later stated that the "SEC had threatened additional action against the Company if Cadwalader and E&Y are not allowed to conduct a prompt and thorough investigation into the six areas the SEC had identified."

55.     Rather than cooperate, Individual Defendant Cao refused to produce responsive information to the Audit Committee and its advisors and used his position and control over the Board and the Company's executive officers and employees to hinder the Audit Committee's truth seeking process.

56.     Due to the Hilead Transaction and Individual Defendant Cao's obstruction of the Audit Committee's investigation, trading in the Company's common stock was halted from trading in August 2011, and ultimately delisted by the Nasdaq, causing severe harm to the Company's ability to take advantage of the capital markets to sustain and grow the Company's business.

57.     In the wake of these disclosures the value of the Company's stock has lost nearly all of its value.

58.     On July 15, 2011, and August 2, 2011, respectively, two securities fraud class actions were filed by investors against the Company and certain of its officers and directors, seeking substantial damages from the Company and others.  *Lagace v. Jiangbo Pharm., Inc.*, Case. No. 11-cv-22556-MGC (S.D. Fla.); *Lewis v. Jiangbo Pharm., Inc.*, Case No. 11-cv-22788-MGC (S.D. Fla).   On August 31, 2011, the two cases were consolidated under the caption of the former.  *Lagace*, Case. No. 11-cv-22556-MGC, ECF No. 6.

59.     On November 1, 2011, the Court in *Lagace* appointed Christopher Brophy and Tara Lewis as Lead Plaintiffs and, on November 16, 2011, ordered that the caption in

the consolidated action be amended to *In re Jiangbo Pharmaceuticals, Inc. Securities Litigation* (the "Securities Action").

60.     On November 16, 2011, Lead Plaintiffs in the Securities Action filed a Consolidated Amended Complaint for Violations of the Securities Laws (the "Amended Securities Complaint").

61.     The Securities Action is a federal securities class action brought on behalf of a class consisting of all persons other than defendants who purchased the securities of Jiangbo between June 8, 2010 and May 31, 2011.  The Amended Securities Complaint asserts claims against: (a) the Company; (b) various directors and officers of Jiangbo, including Defendants Wubo Cao, Jin Linxian, Elsa Sung and Ziling Sun;  (c) CFO Oncall (a Florida firm specializing in financial consulting services); and (d) the Company's outside auditors Frazer LLP and Frost PLLC for violations of the federal securities laws. Specifically, the Securities Action Complaint alleges that the defendants issued materially false and misleading statements and omitted to state material facts that rendered their affirmative statements misleading as they related to the Company's operations, financial condition, and certain financial transactions, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. §240.10b-5).

62.     As a result of the Individual Defendants' deliberate and/or reckless action and/or inaction permitting the Hilead Transaction, causing or permitting the material misrepresentations in the Company's SEC filings, and obstructing or facilitating Individual Defendant Cao's obstruction of the Audit Committee's Investigation, the Individual Defendants have breached their fiduciary duties owed to the Company.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

63.     Plaintiffs bring this action derivatively on behalf of the Company to redress injuries suffered by the Company as a direct and proximate result of the Individual Defendants' conduct. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

64.     Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting the Company's rights.

65.     Jiangbo is incorporated in Florida.  Under Florida law, "[a] complaint in a proceeding brought in the right of a corporation must . . . allege with particularity the demand made to obtain action by the board of directors and that the demand was refused or ignored by the board of directors for a period of at least 90 days from the first demand unless, prior to the expiration of the 90 days, the person was notified in writing that the corporation rejected the demand."  Fla. Stat. § 607.07401(2).

66.     On August 2, 2011, Plaintiff Bruce, through his counsel, served Jiangbo's registered agent in Florida with a written demand, dated August 1, 2011 (copy annexed hereto as Ex. B), that "Jiangbo's Board of Directors "("Board") immediately commence litigation on behalf of the Company against Cao Wubo ("Cao"), Feng Xiaowei ("Feng"), Huang Lei ("Huang"), Ge Jian ("Ge"), Michael Marks ("Marks"), John Wang ("Wang"), Jin Liuxian ("Jin"), Else Sung ("Sung"),  Ziling Sun ("Ziling"), and any other appropriate Jiangbo directors and officers for breaches of fiduciary duty, securities fraud, abuse of control, gross mismanagement, unjust enrichment, and waste of company assets, in connection with their activities as directors and officers of the Company."

67.     The demand letter further stated:

As described in the complaint in the matter styled *Lagace v. Jiangbo Pharmaceuticals, Inc., et al.*, C.A. No. 11-cv-22556-MGC (S.D. Fla.) (the "*Lagace* Complaint"), Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling, among others, engaged in conduct in violation of Section 10(b) of the Securities Exchange Act (the "Act"), 15 U.S.C. § 78j, Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Act, 15 U.S.C. § 78t.  Further wrongdoing is described in a letter dated June 6, 2011, addressed to the Board from former Director and Audit Committee Chairman Marks and former Director and Audit Committee member Wang, Ex. 99.4 to Form 8-K filed with the United States Securities and Exchange Commission ("SEC") on June 7, 2011 (the "AC Letter"), in which Messrs Marks and Wang announced their resignation from the Board.

The AC Letter asserted, among other things, that:

- The Company's senior management stonewalled an investigation of financial irregularities by the Audit Committee commenced after the SEC served a subpoena on the Company in late March 2011, by refusing to produce documents and pay the AC Committee's outside legal counsel and forensic accountant;

- Documents that were not produced as part of the AC Committee investigation went to the heart of the Company's financial statements, and involved matters such as the amount of Jiangbo's cash reserves; its failure to pay interest on its debentures timely; the existence and location of certain bank accounts and the veracity of its bank statements; the number of people employed by the Company; and details regarding its sales, purchases, production, warehouse processes, acquisition of land use rights, computer and IT information, systems, and vendors;

- The Company used secondary accounts and personal accounts to pay expenses;

- Company officials claimed Jiangbo did not use internet banking but wire transfer records showed otherwise;

- Records showed Company officials used personal email accounts to conduct official business;

- Bank records indicated Jiangbo transferred RMB 200 million to Shandong Hilead Biotechnology Co. ("Hilead"), a company founded, chaired, and majority-owned by Cao, even though the two firms had no formal relationship, for the purpose of infusing capital into Hilead; and Company records indicated that Hilead

was in possession of six of Jiangbo's computers;

- Jiangbo would never cooperate with the AC because Cao, as Chairman of the Board, is "the primary source of the lack of cooperation," and asking him to step down would be "futile," "the Board would not act to remove Mr. Cao," and even if he was removed, he "would continue to exercise *de facto* control over the Company and the Board;

- Marks emailed the Board on May 27, 2011, that "I second John [Wang's] concerns about the lack of professionalism within the company over many years of delayed payments, lack of focus of senior management, [and] commitment of company resources to related parties;" the latter reference being to Jiangbo's relationship with Hilead.

The *Lagace* Complaint alleges "Jiangbo issued materially false and misleading statements and omitted to state material facts that rendered their affirmative statements misleading as they related to the Company's operations, financial condition, and certain financial transactions" beginning on May 17, 2010, when the Company filed its Form 10-Q for the quarterly period ended March 31, 2010 (fiscal third quarter). *Lagace* Complaint, ¶¶ 2, 34. The *Lagace* Complaint is based largely on the allegations in the AC Letter. In addition, the *Lagace* Complaint noted that trading of Jiangbo's common shares was halted by the SEC on May 31, 2011, and has yet to resume. *Id.*, ¶¶ 3, 43.

The *Lagace* Complaint listed the following disclosures in the AC Letter as containing materially adverse information that was not provided to the Company's shareholders:

- The Company had misled investors about the number of individuals it employed. As indicated in the Company's SEC filings . . . Jiangbo had approximately 1,400 employees as of May 20, 2010, "including 82 administrative staff, 412 production crew, 440 full-time salespersons and 560 part-time salespersons." However, as disclosed by the [AC L]etter, the current employee list indicates that there are less than 500 individuals employed by the Company.

- The Company's unwillingness to release employee e-mail information, in addition to the fact that only a mere fourteen email addresses were released during the independent investigation, further suggests that the Company materially misrepresented the size of its workforce by nearly a factor of three-to-one.

- [The AC Letter] clearly shows that the Company failed to disclose a 200 million RMB transaction of a related party nature, and that there was an undisclosed "commitment of company resources to related parties."

- The 200 million RMB transaction referenced by the [AC] Letter was to the benefit of Hilead . . . a private company in the same city as Jiangbo's main operating subsidiary.

- Defendant [Cao] is Chairman of the Board of Directors of Hilead, and was undoubtedly aware of the transfer due to his position within the two companies [due to] the fact that he had sole control over check issuance at Jiangbo.

- As a result, Jiangbo's transfer of 200 million RMB to Hilead is of an apparent related party nature. Moreover, the existence of the transfer, as well as its apparent related party nature went completely undisclosed by the Company.

- [B]oth the [AC] Letter and the Company's repeated failure to timely pay the interest and/or principle on the Debentures suggests that the Company either has drastically less cash than reported . . . or that it does not have access to said cash.

- [I]t is a significant and indisputable red flag that a Company with purported cash reserves of more than $100 million would continue to fail in its obligations with respect to the Debentures and thereby incur significant penalties at the expense of its shareholders.

- It is also a red flag that a Company with such purported cash reserves would pay professional fees [to the AC Committee's advisors] from, in one reported instance, an employee's personal checking account, and in the other instance, from a non-primary bank account that has (or should have) significantly less cash than the Company's primary account.

- If the Company does indeed have the cash reserves that it claims, the only other possible inference is that Jiangbo . . . does not have access to the assets of its main operating subsidiary, Laiyang Jiangbo (which, as indicated in the Company's most recent 10-K, has signed an equity pledge with one of Jiangbo's wholly-owned subsidiaries, thereby entitling Jiangbo to 100% of Laying [sic] Jiangbo's assets). This was undisclosed . . . and makes the Company's representation that it operates, controls, and beneficially owns Laiyang Jiangbo materially misleading.

- Lastly, the Company has made material misstatements and omissions with respect to the quality of its internal controls. As indicated by the [AC] Letter, Defendant [Cao] is the only officer or director of Jiangbo that [sic] has "unilateral check approval authority." In effect, this means that Defendant [Cao] – who is not an officer of Jiangbo – has *de facto* dictatorial control over the Company as he is the only member of the [sic] management that [sic] can authorize payments to third parties. This is a significant and material undisclosed weakness in the Company's internal controls.

*     *     *

Jiangbo has already expended millions of dollars in connection with the AC investigation.  It will spend millions more defending the SEC investigation that prompted the AC investigation and the *Lagace* securities fraud action, as well as any other governmental or private investigations or litigation instituted against the Company.  It is inevitable that Jiangbo will be required to restate its financial reports for *at least* the period covered by the *Lagace* action, *i.e.*, May 17, 2010, through May 31, 2011, and probably for a much longer time.  The Company may be liable for hundreds of millions of dollars in damages if it loses or settles the *Lagace* action and any other litigation brought by governmental authorities or private persons or entities.  In addition, the Company faces the prospect of permanent delisting by the NASDAQ.  Furthermore, the Company's reputation has been severely damaged. The Company has also wasted a substantial amount of money in compensation and benefits paid to Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling.  Its market capitalization has been severely diminished, and its ability to raise equity in the future has been all but destroyed.  All of this substantial damage stems proximately from Cao's, Feng's, Huang's, Ge's, Marks's, Wang's, Jin's, Sung's, and Ziling's (and those of others employed by the Company) breaches of fiduciary duty, securities fraud, abuse of control, gross mismanagement, unjust enrichment, and waste of company assets in connection with their activities as directors and officers of the Company, as well as from Frazer's professional negligence, malpractice, and potentially fraudulent activity.

By reason of their positions as directors and/or officers and fiduciaries of Jiangbo, and because of their ability to control the business and corporate affairs of Jiangbo, Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling owed Jiangbo and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Jiangbo in a fair, just, honest, and equitable manner.  Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling were and are required to act in furtherance of the best interests of Jiangbo and

its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Jiangbo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling, because of their positions of control and authority as directors and/or officers of Jiangbo, were able to and did, directly and/or indirectly, consciously commit and/or exercise control over the wrongful acts complained of herein.  Because of their executive, managerial, and director positions with Jiangbo, each of them had knowledge of material non-public information regarding the Company.  Once the members of Jiangbo's Board were placed on notice of material information concerning the Company's affairs, they were required to make immediate public disclosure of that information.  Additionally, once the Board is put on notice of illegal conduct, the Board has a duty to act on that information.

For the reasons described above, Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling all breached their fiduciary duties, committed securities fraud, abused their control, engaged in gross mismanagement, were unjustly enriched, and wasted company assets in connection with their activities as directors and officers of the Company, all of which caused substantial harm to the Company and its shareholders.

Consequently, on behalf of our client, Derek J. Bruce, we hereby demand pursuant to Fla. Stat. § 607.07401, that Jiangbo's Board of Directors immediately commence litigation on behalf of the Company against:  (1) Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling and any other appropriate Jiangbo directors and officers for breaches of fiduciary duty, securities fraud, abuse of control, gross mismanagement, unjust enrichment, and waste of company assets, in connection with their activities as directors and officers of the Company . . . .

Please be advised that the failure to take all of the actions demanded will result in the institution of litigation on behalf of the Company in accordance with the laws of the State of Florida.

68.     On August 12, 2011, Plaintiff Bruce's counsel received by fax a letter of

the same date from the firm of Locke Lord Bissell & Liddell LLP.  The letter advised

Plaintiff Bruce's counsel that the firm "was recently retained by Jiangbo to, among other

things, advise the company and its directors with respect to your letter dated August 1,

2011." (Copy annexed hereto as Ex. C).

69.     Since that time, Plaintiffs received no further communications from Jiangbo or its counsel.

70.     The 90 day period from the date of first demand has run, and Plaintiff Bruce's demand has been ignored by Jiangbo's Board.  As a result, demand is futile pursuant to Fla. Stat. § 607.07401(2).

## FIRST CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
### (Against All Individual Defendants)

71.     Plaintiffs incorporate by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

72.     The Individual Defendants all owed a fiduciary duty to Jiangbo and its stockholders, the duty to exercise loyalty, good faith, due care, candor, and diligence in the management and administration of the affairs of the Company, as well as in the auditing and reporting of the Company, and owed the duty of full and candid disclosure of all material facts thereto.

73.     As fiduciaries, to discharge these duties, the Individual Defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Jiangbo.

74.     In performing the aforementioned services, the Individual Defendants all breached, and continue to breach, their fiduciary duties, causing damages to Jiangbo, by, *inter alia*, (i) agreeing to and participating with and/or aiding and abetting one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders and their family members; (ii) failing to discover and prevent Jiangbo's violations of law (iii) failing to properly implement, oversee and maintain appropriate and adequate internal controls, practices and procedures for Jiangbo; (iv) failing to ensure that Jiangbo operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information; (v) failing to ensure that Jiangbo not engage in any unsafe, unsound, or illegal business practices; (vi) causing Jiangbo to be sued for, and exposed to, liability for violations of the anti-fraud provisions

of the federal securities laws and potential criminal liability, as previously described herein.

75.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company and was made without any reasonable efforts to ensure the Company's interests were protected.

76.     The Individual Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, Jiangbo to suffer substantial monetary damages as a result of the wrongdoing herein, as well as further and even greater damage in the future, including exposure to forfeitures, fines and penalties, damage to Jiangbo's reputation and good will, the resulting loss of business and business opportunities, increased costs of capital, and otherwise.

77.     Jiangbo has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.

78.     Plaintiffs, on behalf of the Company, have no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**GROSS MISMANAGEMENT**
**(Against All Individual Defendants)**

79.     Plaintiffs incorporate by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

80.     The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the Company's operations and business.

81.     The Individual Defendants, by their actions and by engaging in the

wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of the Company in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of the Company's affairs and in the use and preservation of its assets.

82.     During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused the Company to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged the Company.

83.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duties, including the duty of loyalty, as alleged herein, Jiangbo has incurred, and will likely incur in the future, massive financial damages, as well damages to its reputation and goodwill.

84.     As a result of the misconduct and breaches of fiduciary duty alleged herein, each of the Individual Defendants is liable to the Company.

85.     Plaintiffs, on behalf of the Company, have no adequate remedy at law.

**THIRD CAUSE OF ACTION**
**<u>CORPORATE WASTE</u>**
**(Against All Individual Defendants)**

86.     Plaintiffs incorporate by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

87.     By failing to properly consider the interests of the Company and its

shareholders, by failing to conduct proper supervision, and by transferring approximately $30 million in Company funds to an entity controlled by Cao for no apparent business purpose, the Individuals Defendants have caused the Company to waste valuable corporate assets.

88.     As a result of the Individual Defendants' corporate waste, they are liable to the Company.

89.     Plaintiffs, on behalf of the Company, have no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**RESTITUTION/UNJUST ENRICHMENT**
**(Against Individual Defendant Cao)**

90.     Plaintiffs incorporate by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

91.     Defendant Cao was unjustly enriched by his receipt and retention of benefits from the self-interested transactions and the proceeds he received therefrom, as alleged herein, and it would be unconscionable to allow him to retain the benefits thereof.

92.     Plaintiffs, on behalf of the Company, have no adequate remedy at law.

**FIFTH CAUSE OF ACTION**
**CONTRIBUTION AND INDEMNIFICATION**
**(Against All Individual Defendants)**

93.     Plaintiffs incorporate by reference all paragraphs above as if set forth herein. Jiangbo is alleged to be liable to various persons, entities and/or classes by virtue of the same acts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to Jiangbo.

94.     In addition, the Individual Defendants' misconduct and wrongdoing, and the disclosures and events described herein, have had, and will continue to have, a series

of deleterious effects on Jiangbo, including but not limited to: (i) Exposure to forfeitures, fines, and penalties; (ii) Loss of business opportunities; (iii) Damage to Jiangbo's reputation and good will; (iv) Loss of existing or renewal business; (v) Increased costs of capital; (vi) Loss of confidence of the investing public in the integrity and management of Jiangbo, thereby resulting in Jiangbo losing market value and increasing Jiangbo's cost of capital; and (vii) As a result of the Individual Defendants' misconduct, Jiangbo is now exposed to SEC scrutiny and inquiry, and to suit by investors for losses resulting from their misconduct and fraudulent activities, thereby, at a minimum, causing the Company to incur unnecessary direct and indirect investigatory, litigation and administrative costs, and potentially resulting in awards, judgments or settlements against Jiangbo.

95.     By reason of the foregoing violations of law and other related misconduct described herein, Jiangbo's alleged liability arises, in whole or in part, from the intentional, knowing, reckless, disloyal and bad faith acts or omissions of the Individual Defendants as previously alleged herein.

96.     Jiangbo is therefore entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against Jiangbo by virtue of the Individual Defendants' misconduct and wrongdoing.

97.     Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants'

conscious and willful breaches of fiduciary duties and other wrongdoing;

B.      Directing Jiangbo to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein.

C.      Awarding to Jiangbo restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Directing Individual Defendant Cao to disgorge to the Company all of the funds he has received from the Hilead Transaction.

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury for all causes and issues so triable.


Dated: January 27, 2011                     Respectfully submitted,

                                            **THE ROSEN LAW FIRM, P.A.**

                                  By:      */s/ Laurence Rosen*
                                          Laurence M. Rosen
                                          Fla. Bar No. 0182877
                                          275 Madison Avenue, 34th Floor
                                          New York, NY  10016
                                          Tel.:  (212) 686-1060
                                          Fax:  (212) 202-3827

                                          *Attorneys for Plaintiffs*

OF COUNSEL:

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Marc A. Rigrodsky
919 N. Market Street, Suite 980
Wilmington, DE  19801
Tel.:  (302) 295-5310
Fax:  (302) 654-7530
        and
Timothy J. MacFall
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Tel.:  (516) 683-3516
Fax:  (302) 654-7530

**LAW OFFICES OF BRUCE G. MURPHY**
Bruce G. Murphy
265 Llwyds Lane
Vero Beach, FL  32963
Tel.:  (772) 231-4202
Fax:  (772) 234-6608

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this on the 27th day of January 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


/s/ Laurence Rosen

<u>VERIFICATION</u>

I, William Lindquist, am the plaintiff in the within action and am a citizen of the State of Texas. I have read the foregoing amended complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on January 27, 2012 in Montgomery, TX.

*William Lindquist*

William Lindquist