## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| WILLIAM LINDQUIST AND DEREK J. BRUCE, DERIVATIVELY AND ON BEHALF OF JIANGBO PHARMACEUTICALS, INC.,<br><br>                    Plaintiffs,<br><br>         v.<br><br>CAO WUBO, FENG XIAOWEI, HUANG LEI, GE JIAN, GEORGE (GUOQING) ZHOU, JIN LINXIAN, ELSA SUNG, ZILING SUN, MICHAEL MARKS, JOHN (YANG) WANG, AND FRAZER FROST, LLP<br><br>                    Defendants,<br><br>         - and -<br><br>JIANGBO PHARMACEUTICALS, INC., | CASE No.:1:11-cv-23876-MGC<br><br><br>SECOND AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:<br><br>(1) BREACH OF FIDUCIARY DUTY<br>(2) CORPORATE WASTE<br>(3) GROSS MISMANAGEMENT<br>(4) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY<br>(5) PROFESSIONAL NEGLIGENCE<br><br><br>JURY TRIAL DEMANDED |

## SECOND AMENDED AND CONSOLIDATED
## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs respectfully submit this Second Amended Consolidated Verified Shareholder Derivative Complaint against the defendants named herein based upon personal knowledge as to themselves and their own actions, and as to all other matters,

upon information and belief based upon the investigation of counsel.

## INTRODUCTION

1.      This is a shareholder derivative action on behalf of Nominal Defendant, Jiangbo Pharmaceuticals, Inc. ("Jiangbo" or "the Company") against Defendants Cao Wubo, Feng Xiaowei, Huang Lei, Ge Jian, George (Guoqing) Zhou, Jin Linxian, Elsa Sung, Ziling Sun, Michael Marks, and John (Yang) Wang, for violations of fiduciary duties owed by them to Jiangbo.  These violations, in turn, have substantially injured the Company.

2.      As detailed herein, during the Relevant Time Period (defined herein), the Individual Defendants in breach of their fiduciary duties to the Company approved, acquiesced, and/or turned a blind eye to an undisclosed related party transaction between an entity majority owned by defendant Cao Wubo, Shandong Hilead Biotechnology Co., Ltd. ("Hilead") on one hand, and the Company on the other hand (the "Hilead Transfer").

3.      The Individual Defendants caused Jiangbo to transfer RMB 200 million (or approximately $31 million (US) using current exchange rates) to Hilead, and attempted through their action and/or inaction to conceal the true nature of this transfer.

4.      There is no legitimate business reason for the undisclosed transfer of nearly $31 million dollars to Hilead, other than to wrongfully benefit defendant Cao Wubo. When regulators learned of the Hilead Transfer, they initiated proceedings against the Company, and the Company initiated an internal investigation.

5.      Only four months after the initiation of the Company's internal investigation, two independent members of Jiangbo's Audit Committee, Defendants

Michael Marks ("Marks") and John Wang ("Wang") resigned from the Company.  In a 23 page resignation letter, dated June 6, 2011 (the "Resignation Letter") (copy attached hereto as Ex. A), Defendants Marks and Wang detailed the Company's refusal to cooperate with the Audit Committee's investigation; the refusal of defendants Cao Wubo, Linxian Jin, and Elsa Sung to provide necessary materials to the forensic accountant and counsel retained by the Audit Committee in connection with its investigation; and additional financial improprieties.  Defendants breached their fiduciary duty by obstructing the Audit Committee's investigation, and Defendant Sung aided and abetted their breach.

6.      In addition, as alleged more fully below, the Company now faces substantial liability in connection with federal securities fraud class action litigation that has been filed against it and others based upon the same wrongdoing as alleged herein.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2).  Plaintiffs and Defendants are citizens of difference states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

## THE PARTIES

**Plaintiffs**

9.      Plaintiff William Lindquist and Derek J. Bruce are, and at all times relevant hereto were, shareholders of Jiangbo.  Plaintiffs bring this action derivatively in the right of and for the benefit of the Company.  Plaintiffs will fairly and adequately

represent the interests of the Company and its shareholders in enforcing the rights of the Company.  Plaintiff Lindquist is a citizen of the state of Ohio and Plaintiff Bruce is a citizen of Bermuda.

**Nominal Defendant**

10.     Nominal Defendant Jiangbo is a Florida corporation with its principal executive offices located in Laiyang City, Yantai, Shandong Province, People's Republic of China ("PRC").  According to the Company's Form 10-K filed with the United States Securities and Exchange Commission (the "SEC") on September 28, 2010, Jiangbo is a holding company that operates, controls, and beneficially owns through contractual arrangements Laiyang Jiangbo Pharmaceuticals Co. Ltd. ("Laiyang Jiangbo").  "Laiyang Jiangbo researches, develops, manufactures, markets and sells pharmaceutical products and health supplements in the PRC."  Jiangbo's common shares commenced trading on May 12, 2009, on the OTCBB under the ticker symbol "JGBO."  On June 8, 2010, Jiangbo's shares were listed on the Nasdaq Global Market.  Trading of Jiangbo's shares was suspended by the Nasdaq on August 4, 2011, and its shares were delisted on October 17, 2011.

**Individual Defendants – Current Directors**

11.     Defendant Cao Wubo ("Cao") has served as the Company's Chairman of the Board since October 2007.  From October 2007 to June 2010, Cao also served as its Chief Executive Officer ("CEO"). He has served as the chairman and general manager of Laiyang Jiangbo since 2003.  He is the founder of Laiyang Jiangbo.  According to the Company's Schedule 14A filed with the SEC on May 31, 2011, Cao owns approximately 35.8% of Jiangbo's outstanding shares. Cao is also the Chairman, CEO, and majority

owner of Hilead.  Upon information and belief, Cao is a citizen of the PRC.

12.     Defendant Feng Xiaowei ("Feng") has been a Jiangbo director since October 2007.  Feng serves on the Company's Audit Committee, and is Chairperson of the Compensation Committee and the Nominating and Corporate Governance Committee.  Upon information and belief, Feng is a citizen of the PRC.

13.     Defendant Huang Lei ("Huang") has been a Jiangbo director since October 2007.  Huang serves on the Company's Nominating and Corporate Governance Committee.  Upon information and belief, Huang is a citizen of the PRC.

14.     Defendant Ge Jian ("Ge") has been a Jiangbo director since October 2007.  Ge serves on the Company's Compensation Committee and Nominating and Corporate Governance Committee.  Upon information and belief, GE is a citizen of the PRC.

15.     Defendant George (Guoqing) Zhou ("Zhou") has been a Jiangbo director since May 27, 2011.  Zhou is a member of the Company's Audit Committee.  Upon information and belief, Zhou is a citizen of the PRC.

**Individual Defendants – Current and Former Officers**

16.     Defendant Jin Linxian ("Jin") has been Jiangbo's CEO since July 2010. Before that, Jin was Deputy General Manager of Production Technology at Laiyang Jiangbo.  Upon information and belief, Jin is a citizen of the PRC.

17.     Defendant Elsa Sung ("Sung") was Jiangbo's Chief Financial Officer ("CFO") from 2007 until her resignation effective March 31, 2011.  After March 31, 2011 Sung was hired by the Company to work as its consultant.  Sung is a licensed CPA in the State of Georgia and a member of the American Institute of Certified Public Accountants.  Upon information and belief, Sung is a citizen of Florida.

18.     Defendant Ziling Sun ("Sun") has been the Company's Interim CFO since May 12, 2011.  Sun worked at Laiyang Jiangbo prior to being appointed Jiangbo's Interim CFO.  Upon information and belief, Sun is a citizen of Massachusetts.

19.     The defendants described in ¶¶ 11-15 above shall be referred to henceforth as the "Director Defendants."   The defendants described in ¶¶ 11-18 above shall be referred to henceforth as the "Individual Defendants."

### Individual Defendants - Former Directors

20.     Michael Marks ("Marks") was a Jiangbo director from July 18, 2008, until June 6, 2011.  Marks was the Chairperson of the Company's Audit Committee.  Upon information and belief, Marks is a citizen of the PRC.

21.     John (Yang) Wang ("Wang") was a Jiangbo director from September 8, 2008, until June 6, 2011.  Wang was a member of the Company's Audit Committee and Compensation Committee.  Upon information and belief, Wang is a citizen of the PRC.

### External Auditors

22.     On February 25, 2008, Jiangbo's board of directors engaged Moore Stephens Wurth Frazer and Torbet LLP ("Moore Stephens") to serve as the Company's principal accountant to audit the Company's financial statements. Moore Stephens merged with Frost PLLC ("Frost") on January 1, 2010, and changed its name to Frazer Frost, LLP ("Frazer Frost").

23.     Frazer Frost served as Jiangbo's independent auditor throughout the Relevant Period, issuing a "clean" audit opinion with respect to the financial statements set forth in the Company's 2010 Form 10-K.  On April 4, 2011, Jiangbo disclosed that Frazer Frost had notified the Company that it did not intend to stand for re-appointment

as the Company's independent auditor for the next fiscal year.

24.     On May 1, 2011, Frost elected to unwind its merger with Moore Stephens. As a result, the firms resumed their existence as separate entities and dissolved Frazer Frost.

25.     Moore Stephens changed its name to Frazer LLP after the merger with Frost was unwound.

26.     Defendant Frazer Frost, an accounting and consulting firm in Brea, California, and Defendant Frost Frost, an accounting firm with its principal place of business in Little Rock, Arkansas, are liable, as the successor entities of Frazer Frost, for aiding and abetting the Individual Defendants' breaches of fiduciary duties as alleged herein and for conducting their audit and certifying the Company's financial statements with professional negligence.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     The Individual Defendants, because of their positions of control and authority as directors or officers of the Company, were able to and did, directly and indirectly, control or fail to control the wrongful acts complained of herein.  Because of their directorial and executive positions with the Company, each of the Individual Defendants had access to adverse non-public information about the financial condition and operations of the Company, including, without limitation, the misconduct of the other Individual Defendants.

28.     At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of said agency.

29.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial, business, and corporate affairs of the Company. By virtue of such duties, the officers and directors of the Company were required, among other things, to:

      a.     Manage, conduct, supervise and direct the business affairs of the Company in accordance with the laws of the United States, the states and countries in which it conducted business, and the Company's charter and bylaws;

      b.     Implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors, and employees of the Company from violating or acting in contravention to applicable federal and state laws, rules and regulations, and those of the countries in which it conducts business; and

      c.     Refrain from using their status as directors or officers to the detriment of the Company and its shareholders.

30.     Each of the Individual Defendants further owed to Jiangbo the duty of loyalty requiring that each favor Jiangbo's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage, which requires, *inter alia*, scrutiny of interested party transactions and rejection of such transactions which are unfair to the Company or evince corporate waste.  The duty of loyalty further requires a duty of candor requiring full and candid disclosure of all facts relevant to any potential conflict of interest and said interested party transactions.

31.     The Board has an Audit Committee.  According to the Company's May 31, 2011, Schedule 14A, "The purpose of the Audit Committee is to assist the Board in fulfilling its responsibilities to oversee the Company's financial and accounting

operations.  The Audit Committee reviews and is responsible for, among other things, the

Company's system of internal controls, its financial reporting process, the audit process,

and the Company's processes for monitoring compliance with laws and regulations.

Specific responsibilities of our Audit Committee include, among other things:

> •      Review and approve all transactions with affiliates, related parties, directors and executive officers.

> •      Appoint, compensate, retain and oversee the work of any independent auditor engaged for the purpose of conducting the annual audit of the Company's books and records, preparing or issuing an audit report or performing other audit review or attest services for the Company.

> •      Review the independent auditors' performance.

> •      Discuss with the independent auditor and management the independent auditor's judgment about the quality, not just the acceptability, of the Company's accounting principles.

> •      Following an audit, review significant difficulties encountered during the audit.

> •      Review significant disagreements among management and the independent auditors in the preparation of the Company's financial statements.

> •      Review and approve of all transactions with affiliates, related parties, directors and executive officers."

## SUBSTANTIVE ALLEGATIONS

32.      Prior to the end of the Company's fourth quarter and during the fiscal year

ended June 30, 2010, the Individual Defendants in breach of their fiduciary duties to the

Company approved, acquiesced, and/or recklessly ignored an undisclosed related party

transaction between Hilead, which is majority owned by Individual Defendant Cao, and

the Company on the other hand.

33.      The Individual Defendants caused Jiangbo to transfer RMB 200 million

(or $31 million (US) using current exchange rates) to Hilead, and attempted through their action and/or inaction to conceal the true nature of this transfer (the "Hilead Transfer").

34.    According to the Company' Form 10-K filed with the SEC on September 28, 2010, and the Schedule 14A filed with the SEC on May 31, 2011, Jiangbo leased two warehouses from Hilead at a cost of approximately $103,000 for the fiscal year ended June 30, 2010.

35.    There is no legitimate business reason for the undisclosed transfer of nearly $31 million dollars to Hilead, other than to wrongfully benefit Individual Defendant Cao.

36.    Recently, information concerning a possible motive for the Hilead Transfer has been disclosed on the Internet. In a message board posting concerning Jiangbo appearing on *Yahoo! Finance*, dated January 18, 2012, an individual identified as "rto_watcher" writes that Individual Defendant Cao is presently involved in efforts to take Hilead public through an initial public offering:

> Cao Wubo is currently working on a China IPO of his new company Hilead (incidentally, never resolved that whole issue of of [sic] millions of dollars of (Jiangbo? Cao's personal?) money being used to found Hilead...)
> His active backer there seems to be Dr. Li Huang, current Director of the Institute of Microbiology at the Chinese Academy of Science: http://www.im.ac.cn/sklmr/EN%20version/m...
>
> Dr. Li Huang seems to have somehow come across a rather nice car and big house worth a few decades of his salary since meeting Mr. Cao a few years ago, and has since joined Cao Wubo as author of a number of patents, with Cao Wubo (the one and the same we all know and love) as first author. Apparently Cao has picked up quite a bit of chemical engineering since graduating from middle school.
>
> These patents can be searched for by number at China's online database: http://www.sipo.gov.cn/ under the patent numbers:
>
> 201010160253.7

201010160267.9
201020175452.0
201020175477.0
201020175521.8
201020175530.7

Apparently Dr. Huang and his buddies have also issued some official reports on Chinese Academy of Science (CAS) letterhead to the government on behalf on Cao's new company Hilead (aka "Jiangbo II") claiming they've signed letters of intent to sell almost 60,000 Tons of their product in one day and a multiyear agreement to supply 30,000 Tons per year to Dupont in the United States alone in 2009. Oddly, market research firms such as CMAI seem to believe the entire world market size was less than that number, and China customs seems to think Hilead exported less than 20 tons in 2009.

Apparently that has changed in their China IPO prospectus, with those 60,000 no longer being signed with BASF, Dupont, etc. in that same time period, but either with a European company with a long and very hard to pronounce name and seeming randomly arranged vowels and consonants, or the Chinese military, depending on which draft of the prospectus on happened to be reading.

Their auditor comments noted:

1) it seemed highly irregular for them not to provide data such as accounts receivable, inventory, bills of lading, etc...but simply letters of intent to validate their sales. Furthermore, their letters of intent with all their customers seemed to all be written and signed in their own standard format.

2) for all the profits they're making, why haven't they paid any taxes? . . . .
Id.  Thus, the Hilead Transfer may have been consummated to improperly bolster Hilead's financial position in anticipation of that IPO.

37.     The State Intellectual Property Office of the P.R.C. does, in fact, list Individual Defendant Cao as the primary inventor of these patents filed by Hilead.  *See* http://59.151.93.237/sipo_EN/search/quickSearch.do?method=search (last visited on Jan. 20, 2012).  It is noteworthy that along with Individual Defendant Cao, an individual named Wang Zhizhou is listed as one of the inventors on each of these patents. According to *The New York Times*, Wang Zhizhou is a former Deputy General Manager of Cathay Industrial Biotech ("Cathay"), and co-founder of Hilead, who is alleged to

have stolen trade secrets from Cathay which were then used by Hilead.  *See* David Barboza, *Entrepreneur's Rival in China: The State*, *The New York Times* (Dec. 7, 2011), http://www.nytimes.com/2011/12/08/business/an-entrepeneurs-rival-in-china-the-state.html?pagewanted=1&_r=1.

38.     Upon information and belief, a portion of the funds used in the Hilead Transaction was falsely and misleadingly reported in Jiangbo's September 28, 2010 Form 10-K as $17 million in payments made to purchase land use rights.  According to the September 28, 2010 Form 10-K, this was an increase of $8.3 million compared to fiscal year 2009.  In addition, upon information and belief, other monies which the Company misrepresented as constituting payments made in connection with the Company's marketing and sales were also used to fund the Hilead Transaction.

39.     As the $17 million in payments to purchase land use rights occurred, according to the September 28, 2010 Form 10-K, during fiscal year ending June 30, 2010, and as that money was actually transferred out in the Hilead Transaction, the Hilead Transaction occurred during fiscal year ending June 30, 2010.

40.     As a consequence of the $31 million illicit Hilead Transaction, the Company was unable to make the requisite interest payments on its 6% Convertible Subordinated Debentures dated November 6, 2007 (the "2007 Notes") and its 6% Convertible Notes dated May 30, 2008 (the "2008 Notes").  While the Company attributed this to a delay in its ability to transfer cash out of the PRC due to PRC regulations, other companies in China had no problem doing so.

41.     Jiangbo further reported in the September 28, 2010 Form 10-K that as of September 27, 2010, a total of $0.9 million in delinquent accrued interest and related

penalties was owed to the holder of the 2007 Notes and a total of $4.1 million in delinquent accrued interest and related penalties was owed to the holders of the 2008 Notes.

42.     Incorporated as part of the Company's September 28, 2010 Form 10-K was an audit opinion signed by "Frazer Frost, LLP (Successor Entity of Moore Stephens Wurth Frazer and Torbet, LLP …)."  That audit opinion stated:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Jiangbo Pharmaceuticals, Inc. and Subsidiaries as of June 30, 2009 and 2008, and the consolidated results of its operations and its cash flows for each of the years in the three-year period ended June 30, 2010 in conformity with accounting principles generally accepted in the United States of America.

According to the Form 10-K, the Company's auditors were paid more than $300,000 in fees for fiscal 2010.

43.     Attached to the Company's September 28, 2010 Form 10-K was the Certification of Elsa Sung as Jiangbo's Principal Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. That Certification stated:

> I, Elsa Sung, Chief Financial Officer of Jiangbo Pharmaceuticals, Inc. (the "Company"), certify that:
>
> 1.  I have reviewed this report on Form 10-K of Jiangbo Pharmaceuticals, Inc.
>
> 2.  Based on my knowledge, this report ***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3.  ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities*, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*Id*. (Emphasis added).

44. On September 30, 2010, Jiangbo issued a press release announcing its

fourth quarter fiscal year 2010 financial results. Among other things, the Company again reported that it had made payments of $17 million in connection with the acquisition of land use rights.

45.     The Company further reported in that press release that:

Interest expense increased 140.5% to $4.2 million in the fourth quarter of fiscal year 2010, compared to $1.8 million in the year ago period, as a result of additional penalty interest incurred due to the Company's delinquency in paying interest to its convertible debenture holders and its convertible note holders, and significantly increased amortization expenses related to write off of unamortized debt discount as convertible notes were converted into the Company's common shares.

46.     A January 21, 2011 article entitled "Can You Say No to Jiangbo" by Saj Karsan contributor for *Seeking Alpha,* (http://seekingalpha.com/article/247782-can-you-say-no-to-jiangbo) (last viewed on September 11, 2012), reported that despite the fact that Jiangbo was making money and was then-trading at a discount to its net cash, investors should nonetheless be wary because the Company was audited by Moore Stephens Wurth Frazer and Torbet LLP "which just last month was barred from accepting new Chinese clients. The SEC found that the accounting firm 'encountered audit conditions that should have caused them to exercise heightened skepticism, including the discovery of problems with China Energy's internal controls and difficulties completing audit field work, such as inventory not being located where the company said it would be.'" *Id*.

47.     That article further stated:

Besides the track record of the auditors, there are other signs that not all is well with the company. For example, the company has been unable to pay its debt holders, despite an apparent cash balance of $124 million! ***The company claims the money is there, but that the reason for the lack of payment is "partially due to the stricter foreign exchange restrictions and regulations imposed in the PRC starting in December 2008". Other Chinese companies have had no problem***

> ***paying millions of dollars back to their North American investors.*** If Jiangbo
> can't even pay $4 million in interest, what hope do North American shareholders
> have of ever seeing that cash?

*Id*. (Emphasis added).

48.     The failure to disclose the Hilead Transaction, the public misstatements concerning Jiangbo's purported land use payments, and the siphoning off of cash in the Hilead Transaction inured to the detriment of the Company and its public shareholders as it exposed Jiangbo to increased interest expenses, as noted above, as well as regulatory scrutiny and possible sanction by the SEC.

49.     Indeed, when regulators learned of the Hilead Transfer, they initiated an investigation of the Company. The SEC issued a letter of informal investigation to Jiangbo, dated December 22, 2010, requesting the production of certain documents by the Company.  Thereafter, in February 2011, the Company's Audit Committee initiated an internal investigation into the same matters.  Defendant Cao did not cooperate with the regulatory proceedings or the internal investigation. Rather he used his control over the Company and Board to obstruct and ultimately halt the internal investigation concerning the Hilead Transfer.

50.     Defendant Sung knew of, or should have known of, but recklessly disregarded,  the Hilead Transaction because, as Jiangbo's CFO for many years (since 2007 and until the end of March 2011, after the Hilead Transfer took place), she was responsible for reporting accurate and timely historical financial information of the Company pursuant to Section 1350(b) of the Sarbanes-Oxley Act.  Indeed, as alleged above, in the Sarbanes-Oxley Certification attached to the Company's September 28, 2010 Form 10-K, Defendant Sung expressly certified that the Company's internal

controls were designed to ensure that material information relating to Jiangbo is made known to her by others within the Company. As a result of her review of such material financial information relating to Jiangbo, Defendant Sung further certified that the financial information included in the Company's September 28, 2010 Form 10-K "fairly presented in all material respects the financial condition, results of operations and cash flows" of Jiangbo.

51.     In light of the magnitude of the Hilead Transfer, there can be little doubt that it was a material financial transaction for the Company as it was the equivalent of almost one-third of Jiangbo's revenue for the entire fiscal year ending June 30, 2010($97.4 million), and exceeded the Company's net income for the entire fiscal year ending June 30, 2010 ($29.9 million).

52.     Similarly, as CFO, Defendant Sung knew, or should have known of, but recklessly disregarded, that Jiangbo did not spend $17 million on the acquisition of land use rights in fiscal year 2010, as was publicly represented, but that these were sham payments used to conceal part of the transfer of $31 million to Hilead.

53.     In addition, Defendant Sung was well aware that the Hilead Transaction would cause harm to the Company, and ultimately Jiangbo's shareholders, based upon the accrual of penalties and interest stemming from Jiangbo's inability to service the debt relating to the Company's 2007 Notes and the 2008 Notes due to the undisclosed Hilead Transfer. As stated in the Company's 2010 Form 10-K, as of September 27, 2010, a total of $0.9 million in delinquent accrued interest and related penalties was owed to the holder of the 2007 Notes and a total of $4.1 million in delinquent accrued interest and related penalties was owed to the holders of the 2008 Notes.

54.     On March 30, 2011, Jiangbo engaged Bernstein & Pinchuk LLP ("B&P") as its principal accountant to replace Frazer Frost, which advised the Company that it did not intend to stand for re-appointment as its principal accountant for its next fiscal year. The change in accountants was approved by the Audit Committee and the full Board. According to a Form 8-K filed with the SEC on April 4, 2011, the change "did not result from any dissatisfaction with the quality of professional services rendered by FF [Frazer Frost]." Additionally, "[i]n connection with the audit of the Company's financial statements for the fiscal years ended June 30, 2010 and 2009 and the subsequent interim period, (i) there were no disagreements with FF on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedures, which disagreements, if not resolved to FF's satisfaction, would have caused FF to make reference in connection with its opinion to the subject matter of the disagreement, and (ii) there were no "reportable events," as that term is described in Item 304(a)(1)(v) of Regulation S-K."

55.     In a Form 8-K filed with the SEC on April 20, 2011, the Company stated it was notified that, effective April 14, 2011, B&P had entered into a joint venture agreement with Marcum LLP and formed Marcum Bernstein & Pinchuk LLP ("Marcum BP") "in a transaction pursuant to which B&P merged its China operations into Marcum BP and certain of the professional staff of B&P joined Marcum BP as employees of Marcum BP." As a result, on April 14, 2011, B&P resigned as Jiangbo's independent accounting firm and was replaced, with the approval of the Audit Committee, by Marcum BP.

56.     In a Form 10-Q/A filed with the SEC on May 27, 2011, Jiangbo disclosed

for the first time that it had:

> received a letter of informal investigation dated December 22, 2010 from the . . . SEC . . . requesting the Company to provide certain documents. The letter indicated that the Company should not construe the investigation as an indication by the SEC or its staff that any violation of law has occurred or any adverse reflection on any person, entity or security.
>
> In February 2011, the Company, through its Audit Committee, commenced an internal investigation into certain transactions. ***On March 26, 2011, the staff of the SEC having been informed by the Company of its internal investigation, notified the Company that it had begun a non-public formal investigation and requested certain information and materials relating to certain aspects of the Company's public disclosures and operations.*** The SEC has advised the Company that its investigation is not intended to suggest that the SEC believes at this time that the Company has done anything wrong and is in fact a fact finding investigation. ***The Company is committed to cooperating with the SEC Investigation and has responded to the SEC's request for materials and information. In light of the SEC's investigation, the Company, through its Audit Committee, decided that the investigation should be conducted as an independent investigation and that the scope of the independent investigation should cover all issues raised by the SEC Investigation.*** To that end the Audit Committee retained an international, U.S.-based law firm and an international professional accounting firm to conduct a comprehensive review of the issues raised by the SEC Investigation. The SEC Investigation and the Independent Investigation are still in their early stages, and the Company cannot predict the duration or outcome of the investigations, or the impact, if any, those investigations may have on the Company's financial condition or results of operations.

(emphasis added).

57.     The Audit Committee retained the law firm of Cadwalader, Wickersham & Taft LLP ("Cadwalader") to conduct the independent investigation at the direction of the Committee.  The Committee also retained Ernst & Young (China) Advisory Ltd. ("E&Y") to provide forensic accounting services at Cadwalader's direction.

58.     Trading in the Company's shares was halted by the Nasdaq on May 31, 2010 and never resumed.

59.     On June 7, 2011, the Company filed a Form 8-K with the SEC (the "June

7, 2011 8-K").  It said that:

> On May 23, 2011, the Board of Directors of the Company received a letter
> from its independent director, Mr. Michael Marks, dated May 23, 2011
> ("Mr. Marks' First Letter"), in which Mr. Marks informed the Company
> that he did not wish to stand for re-election to the board at the Company's
> 2011 annual meeting of stockholders which is scheduled to be held on
> June 28, 2011 at 9:00 a.m. Beijing Standard Time, which is equivalent to
> June 27, 2011 at 9:00 p.m. U.S. Eastern Standard Time (the "Annual
> Meeting"). As a result, Mr. Marks would also cease to be a member of the
> Company's Audit Committee from the date of the Annual Meeting. Mr.
> Marks informed the Company that his decision not to stand for re-election
> at the Annual Meeting was due to increased professional commitments as
> a result of which he will be unable to commit the appropriate time to the
> Company's affairs.

60.     Marks' First Letter specifically stated:

> With respect to the nomination by the members of Nominating and
> Corporate Governance Committee for my reelection as independent
> director at the company's forthcoming AGM, I would like to inform that
> committee, and the entire Board of Directors of Jiangbo, that I will not be
> standing for reelection as independent director at the forthcoming AGM
> when my current term expires.  I have increasing professional
> commitments and will be unable to commit the appropriate time to
> Jiangbo in the future.  Furthermore, I believe that as part of good corporate
> governance, the company should change its independent directors every
> few years and I am coming up the end of three years of service.
>
> Provided the company continues to fulfill its obligations as a U.S. public
> company, I am willing to serve until the end of my current term and
> continue to assist the company with its endeavors in respect of the capital
> markets and the regulators in the U.S. until the AGM.

61.     The June 7, 2011 8-K further stated the Board had received a similar letter

from Wang.  It stated:

> In addition, on May 23, 2011, the Board of the Company received a letter
> from its independent director, Mr. John Wang, dated May 23, 2011 ("Mr.
> Wang's First Letter"), in which Mr. Wang informed the Company that he
> did not wish to stand for re-election to the board at the Company's Annual
> Meeting. As a result, Mr. Wang would also cease to be a member of the
> Company's Audit Committee and Compensation Committee from the date

of the Annual Meeting.

62.     Wang's First Letter stated:  "As with Michael [Marks], I am also coming on 3 years of service as an independent director. Therefore, I will also not stand for re-election at the upcoming AGM. Please make the appropriate plans with legal counsel to amend the proxy documents as appropriate."

63.     The June 7, 2011 8-K noted that on May 26, 2011, Wang informed the Board by letter ("Wang's Second Letter") that he had certain disagreements with the Company.  Wang's Second letter stated:

> If the Company needs an enumeration of differences there are too many to list exhaustively. Suffice it to say, there are many areas where I have disagreement with the Company. Specifically, I believe the Company should comply with the requests by E&Y and [Cadwalader], including but not limited to the requests for Elsa [Sung]'s computer and a list of all the computers and emails used by employees for business purposes. Moreover, I believe (and the Audit Committee has asked for over a year now) the Company should implement standard 404 policies as suggested by KPMG. Furthermore, I believe (and we have also asked for over a year) the Chairman should delegate check approval control to the CFO or CEO. Finally, I also disagree with the common practice by the company (also related to control over check writing) of late payment of professional fees, expenses, even salaries and financial obligations to investors/debt holders. These practices are unprofessional and increases risk to the company, it's [sic] management and shareholders. Something as little as showing up for organized board calls and participating attentively is an important aspect of this professionalism.
>
> I hope the company can bring its business policies and procedures more in line with international best practices. It is my sincere belief that these improvements would greatly benefit the Company, it's [sic] shareholders and it's [sic] management.
>
> I hope that you can understand why I am not able to include that sentence in the 8K. If you think this email should be disclosed in the 8K then I will stand by that decision. I will leave that decision to the Company.

64.     The June 7, 2011 8-K stated the Board received subsequent letters from each of Marks and Wang, both dated June 6, 2011.  These two letters stated that Marks

and Wang were resigning immediately from the Board and the Audit Committee for the reasons stated in a separate letter to the Board from the Audit Committee, also dated June 6, 2011 (the "Audit Committee Letter").  These three letters dated June 6, 2011 were included as exhibits to the June 7, 2011 8-K.

65.    The Audit Committee Letter contained shocking allegations about the Company's refusal to cooperate with the Committee's independent investigation.  It stated in part:

> the conduct and statements by the Company and those controlling and advising it have demonstrated a clear and continuing lack or cooperation over the past five weeks. Moreover, the manner and timing of the Company's payments to the Audit Committee's advisers (Cadwalader and E&Y) raise additional serious concerns regarding the veracity or correctness of banking information provided by the Company, and regarding the Company's ability and willingness to pay for necessary costs related to the internal investigation. As a result, the Audit Committee has determined that it can no longer effectively conduct an independent investigation as contemplated in the Audit Committee. The independent internal investigation has been halted. Cadwalader and E&Y have withdrawn from their respective engagements with the consent of the Audit Committee, and the independent members of the Audit Committee have determined to resign, effective today, as will be communicated in separate resignation letters to the Board of Directors.

66.    The Audit Committee Letter went on to describe in detail the Audit Committee's repeated efforts to explain to Jiangbo's directors and management, in particular Individual Defendants Cao, the importance of the independent investigation vis-à-vis the SEC investigation; the need for the Committee's investigation to remain independent; the necessity for complete cooperation from the Company; the inability of Cadwalader and E&Y to share information about the investigation with the Company; the requirement that the Company pay Cadwalader and E&Y timely; the potential consequences to the Company if the SEC was not satisfied with the investigation; and

other critical factors regarding the investigation.

67.     Despite this, the Audit Committee Letter described numerous instances in which Individual Defendant Cao, and others such as Individual Defendants Jin and Sung acting at his direction, refused to release information deemed critical by Cadwalader and E&Y including bank statements, claimed he did not understand the purpose of the investigation, requested sensitive information from Cadwalader and E&Y, refused to pay professional fees in full, paid partial fees from a personal rather than a Company account, and maintained the disclosure of certain information would violate Chinese law, among other things.

68.     Individual Defendant Marks summarized his reasons for resigning in the Audit Committee letter as follows:

1.     *Lack of Cooperation.*  Over the past five weeks, the Company has revealed an overall and continuing lack of cooperation, evidenced most recently by the fact that the documents and information received from the Company to date still remain deficient in substantial respects. In light of this conduct, the Audit Committee, Cadwalader and E&Y have been unable to conduct a thorough, independent internal investigation. Despite numerous and lengthy meetings, phone calls, emails, and memoranda in which expert advisors explained the importance of the internal investigation and the Company's cooperation with it, and despite the warnings of the potential serious ramifications of the Company's lack of cooperation, the situation has not improved in any material way. We can conclude that the Company, and in particular Mr. Cao, does not have the intention to cooperate with the internal investigation.

2.     *Manner and Timing of Payments to the Audit Committee's Advisors.*  Although the Company has made certain invoice payments and retainer payments to Cadwalader and E&Y, the manner and timing of those payments have raised serious concerns regarding the Company's willingness and ability to pay for necessary investigative costs, and concerns about the veracity of banking information previously provided to Cadwalader and E&Y. In particular, the Company has previously provided documents

indicating that it has a large cash balance at [redacted in original] representing approximately [redacted in original]% of the Company's cash balance as of December 31, 2010. Nevertheless, the Company has not paid Cadwalader and E&Y from its accounts at [redacted in original]. Rather, the Company has paid the Audit Committee's advisers from either a much smaller Company account at [redacted in original] or, more troubling, from a personal bank account apparently belonging to an individual employee of Jiangbo. The Company also had previously indicated that the Company does not use and does not have access to Internet banking, but the Company transferred funds to the Audit Committee's advisers via Internet banking. Finally, although the Company pledged to timely pay an agreed-upon retainer to Cadwalader, the Company paid that retainer in piece meal and only days after it had indicated it would be paid in full. The Company explained to Cadwalader that the delay and partial payments were due to limitations placed on the Company's transfer of funds by the Company's banks. This explanation for the timing and manner of payment is either a troubling indication that the Company does not have free access to its cash balances, or a misleading excuse meant to hide the fact that the Company is unwilling to timely and fully honor its obligations to the Audit Committee.

3.   *No Realistic Options for Corrective Action.*  The Audit Committee has carefully considered potential ways in which the Company might be able to remediate the current situation, but have concluded that any such steps would be ultimately insufficient to permit the internal investigation to continue. Because we believe the primary source of the lack of cooperation is the Chairman, we have considered asking Mr. Cao to step down during the pendency of the internal investigation. However, we are convinced such a measure would be futile. First, we cannot unilaterally remove the Chairman for the pendency of the investigation, and understand that the Board would not act to remove Mr. Cao. Second, it is unreasonable to believe that Mr. Cao would voluntarily step down as Chairman. Third, even if Mr. Cao were to relinquish the chairman's position during the pendency of the internal investigation, the Audit Committee would fully expect, based on our experience and knowledge of the Company, that Mr. Cao would continue to exercise *de facto* control ever the Company and the Board. The recent and consistent history of the Company's lack of cooperation with respect to the internal investigation is therefore more than likely to continue, and has made it impossible for Cadwalader and E&Y to continue the internal investigation in a credible and appropriate manner. Under such circumstances, the independent members of the Audit Committee can no longer serve

the interests of shareholders by remaining on the Board.

69.     The Audit Committee Letter was signed by Marks and Wang.

70.     Among the issues subject to the investigation were an RMB 200 million capital payment to Hilead, an entity for which Individual Defendant Cao serves as Chairman and CEO and is the majority stockholder, and whether the Company had misrepresented the amount of cash on hand, among other things, in its financial statements.

71.     Notably, according to the Audit Committee Letter, amongst the information sought in the Internal Investigation were details concerning the Company's acquisition of land use rights, as well as information relating to the propriety of payments relating to sales and marketing. The Audit Committee Letter specifically noted that the internal investigation included requests for information concerning a cash transfer of an RMB 200 million payment, as well as information concerning the payments made for the acquisition of land rights use and sales and marketing related payments.  These requests, which fell within the scope of the six areas outlined by the SEC, demonstrate that the transactions at issue – including the Hilead Transaction – occurred prior to the launch of the SEC investigation in December 2010.

72.     The two letters from Marks and Wang dated June 6, 2011 tendered their immediate resignations from the Board.  The June 6, 2011 letter from Marks stated that he was resigning because, "for the reasons detailed in writing to you in a separate letter of today's date, I feel the Company has made it impossible for me to fulfill my duties and that I have no choice but to resign.  It is my sincere hope that the Company can quickly rectify the circumstances that have occasioned my resignation."  The Wang resignation

letter contained substantially the same language.

73.    On August 1, 2011, the Company filed a Form 8-K with the SEC in which

it stated it had received a letter from the Listing Qualifications Staff of the NASDAQ on

July 26, 2011.  The letter said that Nasdaq staff "believes that the continued listing of the

Company's securities on Nasdaq is no longer warranted and has determined to delist the

Company for the following reasons:"

> (1)     Public interest concerns under Nasdaq Listing Rule 5101 raised
> by the efforts of the Company and its Chairman to obstruct the
> independent internal investigation authorized by its Audit Committee, and
> the failure to allow the Audit Committee to fulfill its responsibilities and
> duties;
>
> (2)     The Company's failures to comply with Listing Standard Rule
> 5605(c)(3) and IM-5605-5, which sets forth the responsibilities and
> authority of the Audit Committee, as well as the statutory responsibilities
> and authority of the Audit Committee set forth in Section 10A(m)(2) of
> the Securities Exchange Act of 1934; and
>
> (3)     the failure by the Company to comply with the Audit Committee
> composition requirements of Listing Rule 5605(c)(2)(A).

The July 26, 2011 letter continued:

> Unless the Company requests an appeal of Nasdaq's determination to
> delist by August 2, 2011, trading of the Company's shares of common
> stock will be suspended at the opening of business on August 4, 2011, and
> a Form 25-NSE will be filed with the Securities and Exchange
> Commission, which will result in the Company's securities being removed
> from listing and registration on Nasdaq.
>
> The Company has decided to focus on addressing current issues facing the
> Company and its business and will not appeal Nasdaq's determination.

74.    On October 6, 2011, the Nasdaq filed a Form 25 with the SEC advising

that Jiangbo's stock would be delisted on October 17, 2011, because "Nasdaq Staff

determined that the Company no longer qualified for listing on the Exchange pursuant to

Listing Rules 5101, 5605(c)(3), IM-5605, and 5605(c)(2)(A)."  Trading never resumed

after the Company's stock was suspended on August 4.  Its stock is now nearly worthless, trading on the OTC Pink Sheets in very light volume for well under $0.25 per share.

75.     The purpose of the Audit Committee's investigation was to prevent further harm to the Company through further regulatory actions and potential shareholder litigation.  The Audit Committee subsequently noted that the "SEC had threatened additional action against the Company if Cadwalader and E&Y are not allowed to conduct a prompt and thorough investigation into the six areas the SEC had identified."

76.     Rather than cooperate, Individual Defendant Cao refused to produce responsive information to the Audit Committee and its advisors and used his position and control over the Board and the Company's executive officers and employees to hinder the Audit Committee's truth seeking process.

77.     Defendant Sung also refused to cooperate by providing documents, emails, files, and information requested by the Audit Committee.  Thus, Sung aided and abetted the Defendants' breach of their fiduciary duty to the Company's shareholders by obstructing the investigation.

78.     Due to the Hilead Transaction and Individual Defendant Cao's obstruction of the Audit Committee's investigation, trading in the Company's common stock was halted from trading in August 2011, and ultimately delisted by the Nasdaq, causing severe harm to the Company's ability to take advantage of the capital markets to sustain and grow the Company's business.

79.     In the wake of these disclosures the value of the Company's stock has lost nearly all of its value.

80.     On July 15, 2011, and August 2, 2011, respectively, two securities fraud

class actions were filed by investors against the Company and certain of its officers and directors, seeking substantial damages from the Company and others. *Lagace v. Jiangbo Pharm., Inc.*, Case. No. 11-cv-22556-MGC (S.D. Fla.); *Lewis v. Jiangbo Pharm., Inc.*, Case No. 11-cv-22788-MGC (S.D. Fla). On August 31, 2011, the two cases were consolidated under the caption of the former. *Lagace*, Case. No. 11-cv-22556-MGC, ECF No. 6.

81. On November 1, 2011, the Court in *Lagace* appointed Christopher Brophy and Tara Lewis as Lead Plaintiffs and, on November 16, 2011, ordered that the caption in the consolidated action be amended to *In re Jiangbo Pharmaceuticals, Inc. Securities Litigation* (the "Securities Action").

82. On November 16, 2011, Lead Plaintiffs in the Securities Action filed a Consolidated Amended Complaint for Violations of the Securities Laws (the "Amended Securities Complaint").

83. The Securities Action is a federal securities class action brought on behalf of a class consisting of all persons other than defendants who purchased the securities of Jiangbo between June 8, 2010 and May 31, 2011. The Amended Securities Complaint asserts claims against: (a) the Company; (b) various directors and officers of Jiangbo, including Defendants Wubo Cao, Jin Linxian, Elsa Sung and Ziling Sun; (c) CFO Oncall (a Florida firm specializing in financial consulting services); and (d) the Company's outside auditors Frazer LLP and Frost PLLC for violations of the federal securities laws. Specifically, the Securities Action Complaint alleges that the defendants issued materially false and misleading statements and omitted to state material facts that rendered their affirmative statements misleading as they related to the Company's

operations, financial condition, and certain financial transactions, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. §240.10b-5).

84.     As a result of the Individual Defendants' deliberate and/or reckless action and/or inaction permitting the Hilead Transaction, causing or permitting the material misrepresentations in the Company's SEC filings, and obstructing or facilitating Individual Defendant Cao's obstruction of the Audit Committee's Investigation, the Individual Defendants have breached their fiduciary duties owed to the Company.

## MISCONDUCT BY JIANGBO'S AUDITOR

85.     As its auditor, Frazer Frost knew that that Jiangbo's officers and directors owed fiduciary duties to the Company.

86.     As noted above, the Company's September 28, 2010 Form 10-K and the Schedule 14A filed with the SEC on May 31, 2011, state that Jiangbo leased two warehouses from Hilead at a cost of approximately $103,000 during fiscal year ended June 30, 2010.

87.     As the Company's auditor, Frazer Frost knew, or, in the alternative, was professionally negligent in not knowing, of the Hilead Transfer because it conducted the audit for the Company's fiscal year ended June 2010 financial statements, and, as shown above, the Hilead Transfer was more than just a major transaction.

88.     Thus, Frazer Frost also knew, or, in the alternative, was professionally negligent in not knowing, that Jiangbo's officers and directors were in breach of their fiduciary duties because, despite the lack of any ostensible business purpose, the Company transferred RMB 200 million, or $31 million, to Hilead in the Hilead Transfer.

29

89.     Moreover, Defendant Cao, Jiangbo's Chairman of the Board is also the founder, majority-shareholder and Chairman of the Board of Hilead.  Therefore, the RMB 200 million transfer was a related-party transaction that should have been, but was not, publicly disclosed by Defendant Cao and the other Individual Defendants.

90.     Frazer Frost's audit opinion incorporated in the Company's September 28, 2010 Form 10-K stated that the audit had been conducted in accordance with standards established by the Public Company Accounting Oversight Board (United States) (the "PCAOB Standards").

91.     That was a false statement at the time it was made.

92.     Generally Accepted Accounting Principles ("GAAP") constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

93.     GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

94.     SEC rules and regulations require that publicly traded companies such as Jiangbo include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. (See §13 of the Exchange Act; Rule 10-01(d) of Regulation S-X).

95.     SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles *will be presumed to be misleading or inaccurate*."  [17 C.F.R. § 210.4-01(a)(1)] (emphasis added).

96.     Management retains responsibility for preparing financial statements that

conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility ... Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management ... Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility. AICPA, Professional Standards, vol. 1, AU § 110.02 (1998).

97.     GAAP Statement of Financial Accounting Standards ("SFAS") and SEC regulation S-K required the Company to disclose all material related party transactions.

98.     Statement of Financial Accounting Standards ("SFAS") No. 57 and Accounting Standards Codification ("ASC") No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2; ASC 850-10-50-1.

99.     "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57 ¶ 1; ASC 850-10-05-3. "Affiliate" includes any company that is under common control or management with the public company. SFAS No. 57 ¶ 24(a, b); ASC 850-10-20.

100.    A "related person" is defined by Reg. S-K as including any director or executive officer of the Company, any nominee for director, or any immediate family member of a director or executive officer of the registrant, or of any nominee for director or any 5% or greater shareholder.

101.    Disclosures of related party transactions shall include (a) the nature of the

relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2; ASC 850-10-50-1.

102.    AU Section 150.02, Standards of Field Work at 3 requires auditors to obtain "sufficient appropriate evidential matter" to provide the auditor with a reasonable basis for its opinion.

103.    Therefore, according to GAAS, the auditor's subjective good faith in "believing" its audit provided it with a reasonable basis for its opinion is irrelevant. GAAS requires that the audit provide a reasonable basis for the auditor's opinion, whatever the auditor believes.

104.    "Sufficient appropriate evidential matter" is a term of art.  The auditor can obtain sufficient appropriate evidential matter by confirmation requests, i.e., by direct requests from third parties.  "[R]epresentations from management [..] are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion."  AU Section 333.02.

105.    Rather, auditors are required to confirm representations made by management with third parties.  AU Section 330.08.

106.    Frazer Frost could not have obtained sufficient evidential matter to afford a reasonable basis for its opinion.

107.    PCAOB Standards require auditors actually to confirm transactions, bank balances, taxes paid, etc., through confirmations with the audited company's counterparty.

108.    Even if defendants had not undertaken to report related party transactions, both GAAP and SEC Regulation S-K affirmatively require disclosure of related party transactions in excess of $120,000.  The Hilead Transaction was in excess of $120,000, and should therefore have been reported.

109.    "During the course of the audit, the auditor may become aware of significant transactions that are outside the normal course of business for the entity, or that otherwise appear to be unusual given the auditor's understanding of the entity and its environment. The auditor should gain an understanding of the business rationale for such transactions and whether that rationale (or the lack thereof) suggests that the transactions may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets."  AU Section 316.66.

110.    "Unusual or complex transactions may be associated with high levels of inherent risk and control risk. If the entity has entered into an unusual or complex transaction and the combined assessed level of inherent and control risk is high, the auditor should consider confirming the terms of the transaction with the other parties in addition to examining documentation held by the entity. For example, if the combined assessed level of inherent and control risk over the occurrence of revenue related to an unusual, year-end sale is high, the auditor should consider confirming the terms of that sale." AU Section 330.08.

111.    The $17 million that the Company's September 28, 2010 Form 10-K

allocated to land use expenses was an unusually large transaction, as the monetary size of the transaction was equal to almost 20% of the Company's revenue for fiscal year ended June 30, 2010, and more than 50% of the net income for the entire fiscal year ending June 30, 2010.

112.    Due to the magnitude of the purported $17 million spent on land use expenses, Frazer Frost's duty was to obtain sufficient competent evidential matter about that transaction and its nature.

113.    Upon attempting to obtain confirm the $17 million purportedly spent on land use expenses, Frazer Frost had to have found that that money spent was actually transferred out of the Company in the Hilead Transaction, a related party transaction, which Frazer Frost neglected to disclose.

114.    Frazer Frost complicitly, or, in the alternative, with professionally negligence, certified the Company's September 28, 2010 Form 10-K, which attempted to cover up the Hilead Transfer by accounting for the loss of much of the $31 million through falsely stating that $17 million were spent on the acquisition of land use rights, as well as various payments purportedly made in connection with the Company's marketing and sales.

115.    Hence, Frazer Frost aided and abetted the Individual Defendants' breaches of fiduciary duties by issuing an unqualified audit opinion for Jiangbo as incorporated in the Company's September 28, 2010 Form 10-K.  In the alternative, Frazer Frost was professionally negligent in issuing an unqualified audit opinion for Jiangbo as incorporated in the Company's September 28, 2010 Form 10-K.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

116.    Plaintiffs bring this action derivatively on behalf of the Company to redress injuries suffered by the Company as a direct and proximate result of the Individual Defendants' conduct. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

117.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting the Company's rights.

118.    Jiangbo is incorporated in Florida.  Under Florida law, "[a] complaint in a proceeding brought in the right of a corporation must . . . allege with particularity the demand made to obtain action by the board of directors and that the demand was refused or ignored by the board of directors for a period of at least 90 days from the first demand unless, prior to the expiration of the 90 days, the person was notified in writing that the corporation rejected the demand."  Fla. Stat. § 607.07401(2).

119.    On August 2, 2011, Plaintiff Bruce, through his counsel, served Jiangbo's registered agent in Florida with a written demand, dated August 1, 2011 (copy annexed hereto as Ex. B), that "Jiangbo's Board of Directors "("Board") immediately commence litigation on behalf of the Company against Cao Wubo ("Cao"), Feng Xiaowei ("Feng"), Huang Lei ("Huang"), Ge Jian ("Ge"), Michael Marks ("Marks"), John Wang ("Wang"), Jin Liuxian ("Jin"), Else Sung ("Sung"),  Ziling Sun ("Ziling"), and any other appropriate Jiangbo directors and officers for breaches of fiduciary duty, securities fraud, abuse of control, gross mismanagement, unjust enrichment, and waste of company assets, in connection with their activities as directors and officers of the Company."

120.    The demand letter further stated:

As described in the complaint in the matter styled *Lagace v. Jiangbo Pharmaceuticals, Inc., et al.*, C.A. No. 11-cv-22556-MGC (S.D. Fla.) (the

"*Lagace* Complaint"), Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling, among others, engaged in conduct in violation of Section 10(b) of the Securities Exchange Act (the "Act"), 15 U.S.C. § 78j, Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Act, 15 U.S.C. § 78t.  Further wrongdoing is described in a letter dated June 6, 2011, addressed to the Board from former Director and Audit Committee Chairman Marks and former Director and Audit Committee member Wang, Ex. 99.4 to Form 8-K filed with the United States Securities and Exchange Commission ("SEC") on June 7, 2011 (the "AC Letter"), in which Messrs Marks and Wang announced their resignation from the Board.

The AC Letter asserted, among other things, that:

- The Company's senior management stonewalled an investigation of financial irregularities by the Audit Committee commenced after the SEC served a subpoena on the Company in late March 2011, by refusing to produce documents and pay the AC Committee's outside legal counsel and forensic accountant;

- Documents that were not produced as part of the AC Committee investigation went to the heart of the Company's financial statements, and involved matters such as the amount of Jiangbo's cash reserves; its failure to pay interest on its debentures timely; the existence and location of certain bank accounts and the veracity of its bank statements; the number of people employed by the Company; and details regarding its sales, purchases, production, warehouse processes, acquisition of land use rights, computer and IT information, systems, and vendors;

- The Company used secondary accounts and personal accounts to pay expenses;

- Company officials claimed Jiangbo did not use internet banking but wire transfer records showed otherwise;

- Records showed Company officials used personal email accounts to conduct official business;

- Bank records indicated Jiangbo transferred RMB 200 million to Shandong Hilead Biotechnology Co. ("Hilead"), a company founded, chaired, and majority-owned by Cao, even though the two firms had no formal relationship, for the purpose of infusing capital into Hilead; and Company records indicated that Hilead was in possession of six of Jiangbo's computers;

- Jiangbo would never cooperate with the AC because Cao, as Chairman of the Board, is "the primary source of the lack of cooperation," and asking him to step down would be "futile," "the Board would not act to remove Mr. Cao," and even if he was removed, he "would continue to exercise *de facto* control over the Company and the Board;

- Marks emailed the Board on May 27, 2011, that "I second John [Wang's] concerns about the lack of professionalism within the company over many years of delayed payments, lack of focus of senior management, [and] commitment of company resources to related parties;" the latter reference being to Jiangbo's relationship with Hilead.

The *Lagace* Complaint alleges "Jiangbo issued materially false and misleading statements and omitted to state material facts that rendered their affirmative statements misleading as they related to the Company's operations, financial condition, and certain financial transactions" beginning on May 17, 2010, when the Company filed its Form 10-Q for the quarterly period ended March 31, 2010 (fiscal third quarter).  *Lagace* Complaint, ¶¶ 2, 34.  The *Lagace* Complaint is based largely on the allegations in the AC Letter.  In addition, the *Lagace* Complaint noted that trading of Jiangbo's common shares was halted by the SEC on May 31, 2011, and has yet to resume.  *Id.*, ¶¶ 3, 43.

The *Lagace* Complaint listed the following disclosures in the AC Letter as containing materially adverse information that was not provided to the Company's shareholders:

- The Company had misled investors about the number of individuals it employed. As indicated in the Company's SEC filings . . . Jiangbo had approximately 1,400 employees as of May 20, 2010, "including 82 administrative staff, 412 production crew, 440 full-time salespersons and 560 part-time salespersons." However, as disclosed by the [AC L]etter, the current employee list indicates that there are less than 500 individuals employed by the Company.

- The Company's unwillingness to release employee e-mail information, in addition to the fact that only a mere fourteen email addresses were released during the independent investigation, further suggests that the Company materially misrepresented the size of its workforce by nearly a factor of three-to-one.

- [The AC Letter] clearly shows that the Company failed to disclose a 200 million RMB transaction of a related party nature, and that

there was an undisclosed "commitment of company resources to related parties."

- The 200 million RMB transaction referenced by the [AC] Letter was to the benefit of Hilead . . . a private company in the same city as Jiangbo's main operating subsidiary.

- Defendant [Cao] is Chairman of the Board of Directors of Hilead, and was undoubtedly aware of the transfer due to his position within the two companies [due to] the fact that he had sole control over check issuance at Jiangbo.

- As a result, Jiangbo's transfer of 200 million RMB to Hilead is of an apparent related party nature. Moreover, the existence of the transfer, as well as its apparent related party nature went completely undisclosed by the Company.

- [B]oth the [AC] Letter and the Company's repeated failure to timely pay the interest and/or principle on the Debentures suggests that the Company either has drastically less cash than reported . . . or that it does not have access to said cash.

- [I]t is a significant and indisputable red flag that a Company with purported cash reserves of more than $100 million would continue to fail in its obligations with respect to the Debentures and thereby incur significant penalties at the expense of its shareholders.

- It is also a red flag that a Company with such purported cash reserves would pay professional fees [to the AC Committee's advisors] from, in one reported instance, an employee's personal checking account, and in the other instance, from a non-primary bank account that has (or should have) significantly less cash than the Company's primary account.

- If the Company does indeed have the cash reserves that it claims, the only other possible inference is that Jiangbo . . . does not have access to the assets of its main operating subsidiary, Laiyang Jiangbo (which, as indicated in the Company's most recent 10-K, has signed an equity pledge with one of Jiangbo's wholly-owned subsidiaries, thereby entitling Jiangbo to 100% of Laying [sic] Jiangbo's assets). This was undisclosed . . . and makes the Company's representation that it operates, controls, and beneficially owns Laiyang Jiangbo materially misleading.

- Lastly, the Company has made material misstatements and omissions with respect to the quality of its internal controls. As

indicated by the [AC] Letter, Defendant [Cao] is the only officer or director of Jiangbo that [sic] has "unilateral check approval authority." In effect, this means that Defendant [Cao] – who is <u>not</u> an officer of Jiangbo – has *de facto* dictatorial control over the Company as he is the only member of the [sic] management that [sic] can authorize payments to third parties. This is a significant and material undisclosed weakness in the Company's internal controls.

*       *       *

Jiangbo has already expended millions of dollars in connection with the AC investigation.   It will spend millions more defending the SEC investigation that prompted the AC investigation and the *Lagace* securities fraud action, as well as any other governmental or private investigations or litigation instituted against the Company.   It is inevitable that Jiangbo will be required to restate its financial reports for *at least* the period covered by the *Lagace* action, *i.e.*, May 17, 2010, through May 31, 2011, and probably for a much longer time.   The Company may be liable for hundreds of millions of dollars in damages if it loses or settles the *Lagace* action and any other litigation brought by governmental authorities or private persons or entities.   In addition, the Company faces the prospect of permanent delisting by the NASDAQ.   Furthermore, the Company's reputation has been severely damaged. The Company has also wasted a substantial amount of money in compensation and benefits paid to Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling.   Its market capitalization has been severely diminished, and its ability to raise equity in the future has been all but destroyed.   All of this substantial damage stems proximately from Cao's, Feng's, Huang's, Ge's, Marks's, Wang's, Jin's, Sung's, and Ziling's (and those of others employed by the Company) breaches of fiduciary duty, securities fraud, abuse of control, gross mismanagement, unjust enrichment, and waste of company assets in connection with their activities as directors and officers of the Company, as well as from Frazer's professional negligence, malpractice, and potentially fraudulent activity.

By reason of their positions as directors and/or officers and fiduciaries of Jiangbo, and because of their ability to control the business and corporate affairs of Jiangbo, Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling owed Jiangbo and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Jiangbo in a fair, just, honest, and equitable manner.   Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling were and are required to act in furtherance of the best interests of Jiangbo and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer

of the Company owes to Jiangbo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling, because of their positions of control and authority as directors and/or officers of Jiangbo, were able to and did, directly and/or indirectly, consciously commit and/or exercise control over the wrongful acts complained of herein. Because of their executive, managerial, and director positions with Jiangbo, each of them had knowledge of material non-public information regarding the Company. Once the members of Jiangbo's Board were placed on notice of material information concerning the Company's affairs, they were required to make immediate public disclosure of that information. Additionally, once the Board is put on notice of illegal conduct, the Board has a duty to act on that information.

For the reasons described above, Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling all breached their fiduciary duties, committed securities fraud, abused their control, engaged in gross mismanagement, were unjustly enriched, and wasted company assets in connection with their activities as directors and officers of the Company, all of which caused substantial harm to the Company and its shareholders.

Consequently, on behalf of our client, Derek J. Bruce, we hereby demand pursuant to Fla. Stat. § 607.07401, that Jiangbo's Board of Directors immediately commence litigation on behalf of the Company against: (1) Cao, Feng, Huang, Ge, Marks, Wang, Jin, Sung, and Ziling and any other appropriate Jiangbo directors and officers for breaches of fiduciary duty, securities fraud, abuse of control, gross mismanagement, unjust enrichment, and waste of company assets, in connection with their activities as directors and officers of the Company . . . .

Please be advised that the failure to take all of the actions demanded will result in the institution of litigation on behalf of the Company in accordance with the laws of the State of Florida.

121.   On August 12, 2011, Plaintiff Bruce's counsel received by fax a letter of the same date from the firm of Locke Lord Bissell & Liddell LLP. The letter advised Plaintiff Bruce's counsel that the firm "was recently retained by Jiangbo to, among other things, advise the company and its directors with respect to your letter dated August 1, 2011." (Copy annexed hereto as Ex. C).

122.    Since that time, Plaintiffs received no further communications from Jiangbo or its counsel.

123.    The 90 day period from the date of first demand has run, and Plaintiff Bruce's demand has been ignored by Jiangbo's Board.  As a result, demand is futile pursuant to Fla. Stat. § 607.07401(2).

**FIRST CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(Against All Individual Defendants)**

124.    Plaintiffs incorporate by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

125.    The Individual Defendants all owed a fiduciary duty to Jiangbo and its stockholders, the duty to exercise loyalty, good faith, due care, candor, and diligence in the management and administration of the affairs of the Company, as well as in the auditing and reporting of the Company, and owed the duty of full and candid disclosure of all material facts thereto.

126.    As fiduciaries, to discharge these duties, the Individual Defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Jiangbo.

127.    In performing the aforementioned services, the Individual Defendants all breached, and continue to breach, their fiduciary duties, causing damages to Jiangbo, by, inter alia, (i) agreeing to and participating with and/or aiding and abetting one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders and their family members; (ii) failing to discover and prevent Jiangbo's violations of law (iii) failing to properly implement, oversee and maintain appropriate and adequate internal controls, practices and procedures for Jiangbo; (iv)

41

failing to ensure that Jiangbo operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information; (v) failing to ensure that Jiangbo not engage in any unsafe, unsound, or illegal business practices; (vi) causing Jiangbo to be sued for, and exposed to, liability for violations of the anti-fraud provisions of the federal securities laws and potential criminal liability, as previously described herein.

128.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company and was made without any reasonable efforts to ensure the Company's interests were protected.

129.    The Individual Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, Jiangbo to suffer substantial monetary damages as a result of the wrongdoing herein, as well as further and even greater damage in the future, including exposure to forfeitures, fines and penalties, damage to Jiangbo's reputation and good will, the resulting loss of business and business opportunities, increased costs of capital, and otherwise.

130.    Jiangbo has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.

131.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**GROSS MISMANAGEMENT**
**(Against All Individual Defendants)**

132.    Plaintiffs incorporate by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

133.    The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the Company's operations and business.

134.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of the Company in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of the Company's affairs and in the use and preservation of its assets.

135.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused the Company to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged the Company.

136.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duties, including the duty of loyalty, as alleged herein, Jiangbo has incurred, and will likely incur in the future, massive financial damages, as well damages to its reputation and goodwill.

137.    As a result of the misconduct and breaches of fiduciary duty alleged herein, each of the Individual Defendants is liable to the Company.

138.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

### THIRD CAUSE OF ACTION
### CORPORATE WASTE
### (Against All Individual Defendants)

139.    Plaintiffs incorporate by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

140.    By failing to properly consider the interests of the Company and its shareholders, by failing to conduct proper supervision, and by transferring approximately $30 million in Company funds to an entity controlled by Cao for no apparent business purpose, the Individuals Defendants have caused the Company to waste valuable corporate assets.

141.    As a result of the Individual Defendants' corporate waste, they are liable to the Company.

142.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

### FOURTH CAUSE OF ACTION
### RESTITUTION/UNJUST ENRICHMENT
### (Against Individual Defendant Cao)

143.    Plaintiffs incorporate by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

144.    Defendant Cao was unjustly enriched by his receipt and retention of benefits from the self-interested transactions and the proceeds he received therefrom, as alleged herein, and it would be unconscionable to allow him to retain the benefits thereof.

145.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

### FIFTH CAUSE OF ACTION
### CONTRIBUTION AND INDEMNIFICATION
### (Against All Individual Defendants)

146.    Plaintiffs incorporate by reference all paragraphs above as if set forth

herein. Jiangbo is alleged to be liable to various persons, entities and/or classes by virtue of the same acts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to Jiangbo.

147.    In addition, the Individual Defendants' misconduct and wrongdoing, and the disclosures and events described herein, have had, and will continue to have, a series of deleterious effects on Jiangbo, including but not limited to: (i) Exposure to forfeitures, fines, and penalties; (ii) Loss of business opportunities; (iii) Damage to Jiangbo's reputation and good will; (iv) Loss of existing or renewal business; (v) Increased costs of capital; (vi) Loss of confidence of the investing public in the integrity and management of Jiangbo, thereby resulting in Jiangbo losing market value and increasing Jiangbo's cost of capital; and (vii) As a result of the Individual Defendants' misconduct, Jiangbo is now exposed to SEC scrutiny and inquiry, and to suit by investors for losses resulting from their misconduct and fraudulent activities, thereby, at a minimum, causing the Company to incur unnecessary direct and indirect investigatory, litigation and administrative costs, and potentially resulting in awards, judgments or settlements against Jiangbo.

148.    By reason of the foregoing violations of law and other related misconduct described herein, Jiangbo's alleged liability arises, in whole or in part, from the intentional, knowing, reckless, disloyal and bad faith acts or omissions of the Individual Defendants as previously alleged herein.

149.    Jiangbo is therefore entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against Jiangbo by virtue of the Individual Defendants' misconduct and wrongdoing.

150.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

### SIXTH CAUSE OF ACTION
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
#### (Against Defendant Sung)

151.    Plaintiffs incorporate by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

152.    As Jiangbo's consultant after March 31, 2011 and CFO up until that date, during the Relevant Period, Defendant Sung knew that the Individual Defendants, as the Company's officers and directors, owed fiduciary duties to Jiangbo.

153.    Defendant Sung also knew that the Individual Defendants had breached those duties by obstructing the investigation conducted by the Audit Committee.

154.    Despite the foregoing, Sung obstructed the investigation conducted by the Audit Committee.

155.    Defendant Sung knew that by obstructing the investigation conducted by the Audit Committee, she substantially assisted the Individual Defendants in breaching their duties by obstructing the investigation.

156.    Defendant Sung aided and abetted the Individual Defendants' breach of their fiduciary duties in order to receive lucrative fees in exchange for rendering the "clean" audit opinion.

157.    Jiangbo has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company, and by reason of Defendant Sung's having aided and abetted the Individual Defendants' breach of their fiduciary duties.

158.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## SEVENTH CAUSE OF ACTION
## <u>AIDING AND ABETTING BREACH OF FIDUCIARY DUTY</u>
### (Against Defendant Frazer Frost)

159.   Plaintiffs incorporate by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

160.   As Jiangbo's auditor during the Relevant Period, Defendant Frazer Frost knew that the Individual Defendants, as the Company's officers and directors, owed fiduciary duties to Jiangbo.

161.   Defendant Frazer Frost also knew that the Individual Defendants had breached those duties by engaging in the Hilead Transaction and improperly transferring $31 million from Jiangbo to Hilead, and making materially false and misleading statements in the Company's September 28, 2010 Form 10-K, including, among other things, misrepresentations concerning payments for the acquisition of land rights use, and expenses relating to the Company's sales and marketing efforts.

162.   Despite the foregoing, Defendant Frazer Frost issued a "clean" audit opinion that was incorporated into the Company's September 28, 2010 Form 10-K, representing that the Company's consolidated financial statements "fairly, in all material respects, the consolidated financial position of Jiangbo Pharmaceuticals, Inc. and Subsidiaries as of June 30, 2009 and 2008, and the consolidated results of its operations and its cash flows for each of the years in the three-year period ended June 30, 2010 in conformity with accounting principles generally accepted in the United States of America."

163.   Defendant Frazer Frost knew that such opinion would be, and was, relied upon by the Company's shareholders in assessing the financial condition of the

Company.  Furthermore, Defendant Frazer Frost knew that the inclusion of materially false and misleading statements in the Company's September 28, 2010 Form 10-K exposed the Company to regulatory scrutiny and possible sanctions, as well as potential civil liability.

164.   Defendant Frazer Frost aided and abetted the Individual Defendants' breach of their fiduciary duties in order to receive lucrative fees in exchange for rendering the "clean" audit opinion.

165.   As a result of the Company's reasonable reliance upon Frazer Frost's knowingly made false and misleading audit opinion and certification of the Company's September 28, 2010 Form 10-K, the Company has been damaged because, among other reasons, it was prevented from stopping the occurrence of the Hilead Transaction as the Company relied on Frazer Frost's opinion that did not disclose the Hilead Transaction.

166.   Jiangbo has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company, and by reason of Defendant Frazer Frost's having aided and abetted the Individual Defendants' breach of their fiduciary duties.

167.   Plaintiffs, on behalf of the Company, have no adequate remedy at law.

**EIGHTH CAUSE OF ACTION**
**PROFESSIONAL NEGLIGENCE**
**(Against Defendant Frazer Frost)**

168.   Plaintiffs incorporate by reference each allegation contained in each preceding paragraph above as if fully set forth herein.

169.   Defendant Frazer Frost owed a duty of care to the Company to exercise that degree of skill normally expected of accountants performing auditing services for

public companies.  In performing audits for Jiangbo during the Relevant Period, however, Frazer Frost failed to exercise the degree of care, skill, and competence exercised by competent members of the accounting profession as alleged above.

170.    As a result of the Company's reasonable reliance upon Frazer Frost's negligently made false and misleading audit opinion and certification of the Company's September 28, 2010 Form 10-K, the Company has been damaged because, among other reasons, it was prevented from stopping the occurrence of the Hilead Transaction as the Company relied on Frazer Frost's opinion that did not disclose the Hilead Transaction.

171.    Jiangbo has been directly and substantially injured by reason of Defendant Frazer Frost's professional negligence.

172.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.    Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' conscious and willful breaches of fiduciary duties and other wrongdoing;

B.    Against Frazer Frost and Sung and in favor of the Company for the amount of damages sustained by the Company as a result of Frazer Frost's and Sung's aiding and abetting the Individual Defendants' conscious and willful breaches of fiduciary duties and other wrongdoing;

C.    Against Frazer Frost and in favor of the Company for the amount of damages sustained by the Company as a result of Frazer Frost's

professional negligence;

D.    Directing Jiangbo to take all necessary actions to reform and improve its

corporate governance and internal procedures to comply with applicable

laws and to protect the Company and its shareholders from a repeat of the

damaging events described herein;

E.    Awarding to Jiangbo restitution from the Individual Defendants and

Frazer Frost, and each of them, and ordering disgorgement of all profits,

benefits and other compensation obtained by the Individual Defendants

and Frazer Frost;

F.    Directing Individual Defendant Cao to disgorge to the Company all of the

funds he has received from the Hilead Transaction;

G.    Awarding to Plaintiffs the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and

expenses; and

H.    Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury for all causes and issues so triable.


Dated: September 17, 2011                    Respectfully submitted,

                                             **THE ROSEN LAW FIRM, P.A.**

                                     By:      */s/ Laurence Rosen*
                                             Laurence M. Rosen
                                             Fla. Bar No. 0182877
                                             275 Madison Avenue, 34th Floor
                                             New York, NY  10016
                                             Tel.:  (212) 686-1060
                                             Fax:  (212) 202-3827
                                             *Attorneys for Plaintiffs*

OF COUNSEL:

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Marc A. Rigrodsky
919 N. Market Street, Suite 980
Wilmington, DE  19801
Tel.:  (302) 295-5310
Fax:  (302) 654-7530
        and
Timothy J. MacFall
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Tel.:  (516) 683-3516
Fax:  (302) 654-7530

**LAW OFFICES OF BRUCE G. MURPHY**
Bruce G. Murphy
265 Llwyds Lane
Vero Beach, FL  32963
Tel.:  (772) 231-4202
Fax:  (772) 234-6608

## **VERIFICATION**

I, DEREK J. BRUCE, hereby declare, under penalty of perjury as follows:

I am one of the plaintiffs in the shareholder derivative action entitled *Lindquist, et al. v. Cao Wubo, et al.*, Case No.: 1:11-cv-23876-MGC (S.D. Fla.).   I have read the attached Second Amended and Consolidated Verified Shareholder Derivative Complaint (the "Amended Complaint") and authorized its filing.   Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: September _17_, 2012

_____
DEREK J. BRUCE

## VERIFICATION

I, William Lindquist, am a plaintiff in the within action and am a citizen of the State of Texas. I have read the foregoing second amended consolidated complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 17, 2012 in Montgomery, TX.

William P. Lindquist
William Lindquist

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this on the 18th day of September 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


/s/ Laurence Rosen